171 P.3d 435 (2007)
2007 UT 82
STATE of Utah, in the interest of B.R., J.R., N.R. and K.M., persons under eighteen years of age.
State of Utah, Petitioner,
v.
S.M., Respondent.
Nos. 20060875, 20060886.
Supreme Court of Utah.
October 26, 2007.
*436 Mark L. Shurtleff, Att'y Gen., John M. Peterson, Asst. Att'y Gen., Salt Lake City, Nathan W. Jeppsen, Tremonton, for petitioner.
Angela Fonnesbeck, Logan, for respondent.
Martha Pierce, Guardian ad Litem, Salt Lake City.
DURHAM, Chief Justice:
¶ 1 S.M., the mother of four children, B.R., J.R., N.R., and K.M.,[1] had her parental rights terminated by the juvenile court due to findings of neglect and unfitness resulting from her struggle with methamphetamine abuse.[2] The court of appeals reversed and we granted certiorari to review that decision. We hold that the juvenile court acted within its discretion in terminating the mother's parental rights and therefore reverse the court of appeals.

*437 BACKGROUND
¶ 2 In May 1996, S.M. began a pattern of methamphetamine drug abuse that eventually resulted in the State taking custody of her four children. From 1996 until S.M.'s parental rights termination trial in August 2005, S.M.'s longest period of sobriety was three years. The Division of Child and Family Services (the Division) began a lengthy involvement with S.M. and her children in March 2001, and the children's current out-of-home placement was precipitated by S.M. dropping her children off at a Child and Family Support Center in April 2004. After leaving the children, S.M. telephoned her former caseworker, stating that she could no longer care for the children and admitting that she had relapsed and was using methamphetamine. Once in the State's custody, the children's hair was tested, and the tests determined that all four children had been exposed to methamphetamine.
¶ 3 Following the relinquishment of her children, S.M. was given twelve months to comply with the Division's service plan for reunification. The plan required S.M. to complete substance abuse treatment, participate in mental health counseling, obtain stable employment and housing, and attend visitation with her children. A permanency hearing was held in April 2005, one year after the children's removal. The juvenile court concluded after that hearing that S.M. had failed to substantially comply with the service plan. The court described S.M.'s attempts at substance abuse treatment as "sporadic and not consistent." S.M. continued to use methamphetamine throughout the twelve-month reunification period. She began, but did not complete, three substance abuse treatment programs. She attended thirty-four visits with the children over the twelve-month period, missing other visits because she was under the influence of methamphetamine. At the permanency hearing, S.M. did not have stable housing for the children and she was not employed. She had attended only a few mental health counseling sessions. Looking not only to failed compliance with the service plan, but also to the emotional and physical well-being of the children and the detrimental effects of the persistent instability thrust upon these children by their mother's lifestyle,[3] the juvenile court terminated reunification services and set the new goal of adoption for the children. The court made its findings in these matters by clear and convincing evidence.
¶ 4 The State subsequently sought to terminate S.M.'s parental rights. A trial was held four months after the permanency hearing. In making its findings on the issue of whether S.M.'s rights would be terminated, the court adopted many of its findings from the permanency hearing. The court determined that those findings that were relevant to S.M.'s ability to provide a safe home for the children at the April permanency hearing were informative as to her fitness as a parent at the August trial. Also relevant was S.M.'s conduct during the months between the permanency hearing and the termination trial. The juvenile court considered the efforts S.M. had made during that time. Those efforts included S.M.'s current involvement with a Twelve Step Program and the court's recognition that she was "in the initial stages of her recovery." The court noted, however, that this was the fourth program she had participated in and that she had not completed a program since her children were placed in the State's custody. The court further recognized that, since the permanency hearing, S.M. had participated in mental health counseling and in outpatient treatment focused on maintaining sobriety and avoiding domestic violence. In addition to the individual treatment, S.M. had also participated in some group therapy sessions  five targeting domestic violence and one focused on substance abuse. Her therapist acknowledged at trial that he could not predict S.M.'s future sobriety and that such a prediction was difficult because she had previous periods of sobriety after which she returned to chronic drug use. Other significant changes in S.M.'s circumstances following the permanency hearing included her having secured *438 housing, although she had been in her own apartment for less than a month at the time of trial, and having been employed for a two-month period, in contrast to one day of employment during the entire twelve-month period of reunification services.
¶ 5 Although the court acknowledged the steps S.M. had taken following the permanency hearing, the court weighed the mother's attempts during that short time frame against nine years of chronic drug use marked by periods of sobriety and relapse. It concluded that, overall, S.M. had made only "token" and "minimal" efforts to "adjust her circumstances, conduct, and conditions to make it in the children's best interest to return to her home," "to prevent neglect of the children, to eliminate the risk of serious physical, mental, or emotional abuse of the children, and to avoid being an unfit parent." The court then concluded that S.M. had substantially neglected the children, that she was unfit, that she had experienced a failure of parental adjustment, and that it was not possible to safely reunite the children with her. Further, the juvenile court determined that "[t]here is a substantial likelihood that mother will not be capable of exercising proper and effective parental care in the near future." In fact, the court concluded that, because of the history of the case and S.M.'s lengthy involvement with illegal substances, "if the Court were to return the children to [S.M.], it is likely that within six months to a year, we would be right back where we are now, with the children in custody after having been exposed to their [mother's] use of methamphetamine." The court terminated S.M.'s parental rights. In rendering its decision, the court considered not only S.M.'s past and present conduct, but also the special physical, mental, and emotional needs of the children[4] and determined that the decision to terminate parental rights was in their best interests.
¶ 6 S.M. appealed, and the court of appeals reversed the juvenile court. The State and the Guardian ad Litem petitioned this court for certiorari review, which was granted. We now reverse the court of appeals, vacate its opinion, and remand the case directly to the juvenile court. Our jurisdiction is appropriate pursuant to Utah Code section 78-2-2(3)(a), (5) (2002).

ANALYSIS
¶ 7 Although the State and the Guardian ad Litem asked us to review many aspects of the court of appeals' opinion,[5] we treat only two: (1) whether it was permissible for the juvenile court to use a heightened evidentiary standard at the permanency hearing, and (2) whether the court of appeals erred in its review of the juvenile court's decision by reweighing the evidence. In order to remedy the parties' other concerns, we vacate the opinion of the court of appeals.
I. THE JUVENILE COURT'S USE OF THE CLEAR AND CONVINCING EVIDENTIARY STANDARD AT THE PERMANENCY HEARING WAS PROPER
¶ 8 The juvenile court made findings using the heightened clear and convincing evidentiary standard at S.M.'s permanency hearing. S.M. never objected to the use of the heightened standard  not in response to the court's permanency order, not at the termination trial, and not on appeal to the court of appeals. The court of appeals, however, concluded that by using the heightened standard, "the juvenile court took it upon itself to treat Mother's permanency hearing as a sort of pre-termination hearing." S.M. v. State (State ex rel. B.R.), 2006 UT App 354, ¶ 76, 144 P.3d 231. The court of appeals concluded that by finding facts by clear and convincing evidence, the juvenile court was erroneously addressing termination and use *439 of the heightened standard "resulted in Mother going into her termination trial in the face of a multitude of previously established facts." Id. We review the court of appeals' decision for correctness and disagree with its conclusion. Use of the clear and convincing standard at a permanency hearing is not improper, and all parties to these proceedings should be aware that the trial court has the option of making findings by the heightened standard.[6]
¶ 9 At a permanency hearing where reunification services have previously been ordered by the court, the juvenile court is charged with determining "whether the minor may safely be returned to the custody of the minor's parent." Utah Code Ann. § 78-3a-312(2)(a) (Supp.2007). The juvenile court may determine that the child may not be returned to her parent only "[i]f the court finds, by a preponderance of the evidence, that return of the minor would create a substantial risk of detriment to the minor's physical or emotional well-being." Id. § 78-3a-312(2)(b).
¶ 10 Contrary to S.M.'s assertions and the court of appeals' opinion, the juvenile court did not make conclusions about the termination of S.M.'s parental rights at the permanency hearing. It simply made factual findings that were necessary to its determination of the children's safety for the reunification services question by a standard of proof higher than that required by the statute. Those findings, while relevant to the termination question and relied on later by the juvenile court in its consideration of the termination issue, did not mandate a particular outcome at the termination trial. The same conduct that was relevant in determining the children's safety was also relevant to S.M.'s termination. However, S.M.'s unfitness and failure of parental adjustment, along with other grounds for termination of parental rights contained in Utah Code section 78-3a-407, were not considered by the juvenile court at the permanency hearing. Instead, the failure to substantially comply with the service plan, including sporadic and inconsistent attempts at substance abuse treatment, missed visits with the children due to continued drug use, a lack of stable housing and employment, and failure to attend mental health treatment, were factual findings relied upon by the juvenile court in determining that the children could not be safely returned to their mother's custody. These questions  whether the children could be safely returned and whether continued provision of reunification services was warranted  were the only issues considered at the April 2005 permanency hearing. Contrary to the court of appeals' assertion, S.M. was not deprived of notice that termination would be considered at the permanency hearing because, in fact, termination was never considered. The evidence presented at the permanency hearing regarding S.M.'s conduct and her lack of substantial compliance with the service plan, however, was relevant to the separate and subsequent issue of termination, and there was no detriment to S.M. in the court's reliance at the termination hearing on that evidence, which had been already subjected to the appropriate standard of proof.
¶ 11 In this case, the juvenile court's adoption of factual findings from the permanency hearing when it considered termination of S.M.'s parental rights avoided the necessity of reintroducing all of the evidence previously produced at the permanency hearing. Moreover, and importantly, those findings were supplemented with new information offered at the termination trial, including significant evidence about S.M.'s conduct after the permanency hearing and up to the date of the termination trial. Use of the earlier findings allowed the court to forgo hearing the same evidence twice. The facts related to S.M.'s conduct prior to the permanency hearing could not change between the two proceedings  history could not be rewritten.[7] *440 S.M. could not fail to substantially comply with the service plan up until April 2005 at one hearing and then demonstrate substantial compliance for the same time period four months later. In fact, use of a heightened standard for proof of noncompliance is more protective of S.M.'s rights at the permanency hearing.[8] We stress that merely because the same evidence may be relevant at a permanency hearing and a termination trial, the overlapping evidence does not amount to a predetermination of the termination issue. As in this case, the juvenile court did not consider whether termination was appropriate  i.e., S.M.'s unfitness  until the August termination trial; the permanency hearing merely focused on the ability to safely return the children to S.M.'s custody. Thus, we conclude that use of the heightened evidentiary standard of clear and convincing evidence at the permanency hearing is permissible.
II. THE COURT OF APPEALS ERRED IN SUBSTITUTING ITS JUDGMENT FOR THAT OF THE JUVENILE COURT IN ITS REVIEW OF THE TERMINATION DECISION
¶ 12 We review the court of appeals' decision for correctness "with particular attention to whether the court of appeals reviewed the trial court's decision under the correct standard." State v. Worwood, 2007 UT 47, ¶ 11, 164 P.3d 397. Whether a parent's rights should be terminated presents a mixed question of law and fact. Certainly, the legal standard of unfitness is the ultimate question, but such decisions rely heavily on the juvenile court's assessment and weighing of the facts in any given case. Because of the factually intense nature of such an inquiry, the juvenile court's decision should be afforded a high degree of deference. It is in an "advantaged position with respect to the parties and the witnesses." State ex rel. M.S. v. Salata, 806 P.2d 1216, 1218 (Utah Ct.App.1991) (internal quotation marks omitted). Thus, in order to overturn the juvenile court's decision "[t]he result must be against the clear weight of the evidence or leave the appellate court with a firm and definite conviction that a mistake has been made." S.B.D. v. State (State ex rel. Z.D.), 2006 UT 54, ¶¶ 33, 40, 147 P.3d 401 (considering a pure question of fact and stating that "[a]n appellate court must be capable of discriminating between discomfort over a trial court's findings of fact  which it must tolerate  and those that require a court's intercession. It must forebear disturbing the `close call.'"). Therefore, in this case, the juvenile court's decision could be overturned only if it either failed to consider all of the facts or considered all of the facts and its decision was nonetheless against the clear weight of the evidence. When a foundation for the court's decision exists in the evidence, an appellate court may not engage in a reweighing of the evidence. We conclude, as the court of appeals did, that the juvenile court considered all of the evidence. We also conclude, contrary to the court of appeals, that the juvenile court properly exercised its discretion in weighing the totality of the evidence and determining that S.M.'s rights should be terminated.
¶ 13 In termination cases, the juvenile court must weigh a parent's past conduct with her present abilities. As the court of appeals has recognized:
[T]he weight which a juvenile court must give any present ability evidence is necessarily dependent on the amount of time during which the parent displayed an unwillingness or inability to improve his or her conduct and on any destructive effect the parent's past conduct or the parent's delay in rectifying the conduct has had on *441 the parent's ability to resume a parent-child relationship with the child. Thus, although the court has a duty to look forward  i.e., to look at the parent's present ability and the likelihood that the parent will be able to resume parenting within a reasonable time  the court must consider such evidence in light of the parent's past conduct and its debilitating effect on the parent-child relationship. That is, if a parent has demonstrated some improvement in parenting ability but not a strong likelihood that the parent can provide a proper home for the child in the very near future, after a long period of separation, a history of problems and failure to remedy, and deterioration of the relationship between the child and parent, this court should not overturn a court's order terminating parental rights.
S.L. v. State (State ex rel. M.L.), 965 P.2d 551, 561-62 (Utah Ct.App.1998) (footnote omitted). This standard required the juvenile court to consider the totality of the evidence regarding S.M.'s parenting  all of her conduct up to the termination trial. In this case, as noted above, the juvenile court did weigh all the appropriate evidence. Although it adopted findings regarding the mother's past conduct from the permanency hearing, it also considered the steps she had taken during the months between the two proceedings. The court of appeals recognized that the juvenile court had considered the mother's past and present conduct. However, it concluded that the juvenile court's interpretation of some facts was clearly erroneous[9] and disagreed with the emphasis that the juvenile court placed on S.M.'s pre-permanency and post-permanency hearing conduct.
¶ 14 The court of appeals gave more emphasis to S.M.'s recent efforts than the juvenile court did, identifying S.M.'s post-permanency hearing efforts as "substantial rehabilitative efforts." State ex rel. B.R., 2006 UT App 354, ¶¶ 105-06, 144 P.3d 231; see also id. ¶¶ 91, 110. In contrast, the juvenile court looked to all of the evidence, including S.M.'s recent rehabilitation efforts and her past conduct characterized by periods of sobriety followed by relapse, and determined that based on the weight of all the evidence, a brief period of improvement did not overcome her lengthy history of drug abuse and neglect.[10] In overturning the juvenile court's determinations of neglect, unfitness, failure of parental adjustment, failure to remedy the circumstances leading to state custody of the children, and that only token efforts had been made by the mother, the court of appeals concluded that the juvenile court had given insufficient weight to the evidence of S.M.'s rehabilitative efforts. Id. ¶¶ 107, 110, 117, 123, 124. The court of appeals stated that "Mother's previous drug use and other prior failings do not outweigh the evidence of present parenting ability." Id. ¶ 130. It concluded that S.M. "has as good a chance of remaining drug-free as any recovering addict" and characterized as speculative the juvenile court's determination that, based upon the history of the case, if the children were returned to S.M., the children would likely be back in the State's custody within six months due to the mother's drug use. Id. ¶ 108. In this court's opinion, the conclusion that S.M. is likely to recover is equally as speculative as the conclusion that she is likely to relapse. At trial, S.M.'s therapist testified *442 that he could not predict future sobriety in light of her past episodes of sobriety followed by relapse, and his testimony was cited in the juvenile court's order in support of the decision to terminate parental rights. This case presents an inappropriate substitution of the court of appeals' judgment for that of the juvenile court. The juvenile court's determination that S.M.'s recent and eleventh-hour attempts to become a fit parent could not overcome the years of drug abuse and neglect that her children had experienced was not against the clear weight of the evidence, and the juvenile court properly exercised its discretion in making this determination. Simply because an appellate court may have come to a different result had it been the initial trier of fact does not permit it to reverse the juvenile court absent a firm and definite conviction that the court's decision was against the clear weight of the evidence. This is not such a case.
¶ 15 As required by State ex rel. M.L., the court of appeals and the juvenile court also considered the debilitating effect that S.M.'s conduct had on the parent-child relationship. 965 P.2d at 561-62. The court of appeals, citing to continued love between S.M. and her children and a continued relationship, concluded that only "minimal deterioration in the parent-child relationship" had occurred. State ex rel. B.R., 2006 UT App 354, ¶¶ 112-13 & n. 29, 144 P.3d 231. However, despite continued love, which will almost always exist when a child has formed a bond with a parent, "`[f]rom the child's perspective, at least, the earlier period of stagnation is not necessarily wiped out by the later improvement. The harm may have been done.'" State ex rel. M.L., 965 P.2d at 562 (quoting In re B.M., 165 Vt. 331, 682 A.2d 477, 480 (1996)). In this case, the mother chronically used drugs from the time her oldest child was two years old and during the entire period that she had custody of her youngest three children. Unfitness and neglect occur when a parent "habitual[ly] or excessive[ly] use[s] . . . controlled substances, or dangerous drugs that render the parent unable to care for the child." Utah Code Ann. § 78-3a-408(2)(c) (Supp.2007). Harm has clearly been done to the parent-child relationship as a result of S.M.'s drug abuse, her neglect of the children, and the children's placement in state custody as a result of their mother's conduct. The juvenile court determined that such harm was not overcome by S.M.'s post-permanency hearing attempts at rehabilitation and compliance with her service plan. The juvenile court did not err in concluding that nine years of chronic drug use, including twelve months of continued drug use during the reunification period, was not outweighed by S.M.'s recent efforts.

CONCLUSION
¶ 16 In conclusion, it is permissible for a juvenile court to make findings using a clear and convincing evidentiary standard at a permanency hearing. Additionally, the court of appeals erred in substituting its judgment for that of the juvenile court in its review of the termination decision. The juvenile court acted within its discretion in terminating S.M.'s parental rights. We vacate the opinion of the court of appeals and reinstate the findings of the juvenile court. In the interest of expediting the long delayed permanent placement of these children, we remand the case directly to the juvenile court.
¶ 17 Associate Chief Justice WILKINS, Justice DURRANT, Justice PARRISH, and Justice NEHRING concur in Chief Justice DURHAM's opinion.
NOTES
[1] When the children were initially placed in the State's custody, B.R. was ten years old, J.R. was six years old, N.R. was three years old, and K.M. was eighteen months old. They are now thirteen, nine, six, and four.
[2] The juvenile court also terminated the parental rights of N.R. and K.M.'s father. He did not appeal, and thus we focus only on the circumstances relevant to the mother's case.
[3] The children's lives were marked not only by their mother's drug abuse, but also by frequent moves.
[4] All four of the children were placed in foster homes with specialized levels of care due to their needs.
[5] One example bears mentioning. The court of appeals directed juvenile courts to consider the risk that an adoptive placement may be disrupted in considering the best interests of the child in the context of permanency planning and termination of parental rights. S.M. v. State (State ex rel. B.R.), 2006 UT App 354, ¶ 71, 144 P.3d 231. We do not think this is consistent with statute or public policy, but in view of our decision to vacate of the appellate court's opinion, we do not address it further.
[6] In this case, it is not clear when S.M. knew that the heightened standard was being used, but she did not object to the trial court's findings which made it very clear. Nor did she object at the termination trial or before the court of appeals.
[7] S.M. could, in fact, challenge the conclusions and findings from the permanency hearing with evidence at the termination trial if such evidence existed. We are at a loss to understand why a parent would fail to present evidence at the permanency hearing itself if such evidence existed contradicting the State's assertions that he or she did not substantially comply with the service plan and that the children could not be safely returned to the parent.
[8] The court of appeals reached a contrary conclusion, determining that the heightened standard prejudiced the parent and violated her due process rights because the parent was not afforded notice that the termination issue would be considered at the permanency hearing. State ex rel. B.R., 2006 UT App 354, ¶¶ 75-81, 144 P.3d 231. However, as noted in the text, termination was not considered by the juvenile court at the permanency hearing. Furthermore, S.M. fully participated in both hearings, had notice of the issues in controversy, and was afforded a full opportunity to present all relevant evidence.
[9] We disagree with the court of appeals' conclusion that many of the juvenile court's findings were clearly erroneous. S.M.'s recent improvements do not render the juvenile court's findings that she had failed to complete a drug program, failed to complete counseling, and failed to maintain stable housing and employment clearly erroneous. State ex rel. B.R., 2006 UT App 354, ¶ 106, 144 P.3d 231. S.M. had only begun drug treatment, begun participating in mental health counseling, obtained housing for less than one month, and sustained employment for two months. These events do not render any of the juvenile court's findings clearly erroneous.
[10] We note that all of S.M.'s improvements occurred after the permanency hearing. Such improvements may be adequate in some cases  "[a]lthough it may be a difficult feat to accomplish, the parent may still be able to change circumstances such that when the petition is tried, the juvenile court will not find by clear and convincing evidence grounds for terminating parental rights." State v. J.N. (State ex rel. J.N.), 960 P.2d 403, 408 n. 8 (Utah Ct.App.1998). But in this case, the juvenile court was within its discretion to conclude otherwise.