**2017 UT App 108**

## THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF S.M., A.M., L.M., AND Y.M.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

V.S.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Per Curiam Opinion
No. 20170284-CA
Filed July 7, 2017

Third District Juvenile Court, Salt Lake Department
The Honorable C. Dane Nolan
No. 1114145

Michael J. Scott, Attorney for Appellant

Sean D. Reyes, Carol L.C. Verdoia, and John M.
Peterson, Attorneys for Appellee

Martha Pierce, Guardian ad Litem for A.M.,
L.M., and Y.M.

Before JUDGES GREGORY K. ORME, J. FREDERIC VOROS JR., and
DAVID N. MORTENSEN.

PER CURIAM:

¶1      V.S. (Mother) appeals the termination of her parental
rights to her children. We affirm.

¶2      "Whether a parent's rights should be terminated presents
a mixed question of law and fact." *In re B.R.*, 2007 UT 82, ¶ 12,
171 P.3d 435. "Because of the factually intense nature of such an
inquiry, the juvenile court's decision should be afforded a high

degree of deference." *Id.* "Thus, in order to overturn the juvenile court's decision '[t]he result must be against the clear weight of the evidence or leave the appellate court with a firm and definite conviction that a mistake has been made.'" *Id.* (alteration in original) (quoting *In re Z.D.*, 2006 UT 54, ¶¶ 33, 40, 147 P.3d 401). Further, "[w]hen a foundation for the court's decision exists in the evidence, an appellate court may not engage in a reweighing of the evidence." *Id.*

¶3 The juvenile court determined that several grounds supported termination of Mother's parental rights. The juvenile court concluded that Mother neglected or abused the children, *see* Utah Code Ann. § 78A-6-507(1)(b) (LexisNexis 2012), and was an unfit or incompetent parent, *see id.* § 78A-6-507(1)(c). The court also concluded that Mother failed in her parental adjustment because the Division of Child and Family Services (DCFS) made reasonable and appropriate efforts to return the children to her and that Mother had been "unable or unwilling, within a reasonable time, to substantially correct the circumstances, conduct, or conditions that led to placement of [the children] outside [her] home." *See id.* § 78A-6-507(1)(e). The court further concluded that the children had been in an out-of-home placement under the supervision of DCFS, *see id.* § 78A-6-507(1)(d)(i); that Mother had "substantially neglected, willfully refused, or ha[d] been unable or unwilling to remedy the circumstances that caused the child to be in an out-of-home placement," *see id.* § 78A-6-507(1)(d)(ii); and that "there is a substantial likelihood that [Mother] will not be capable of exercising proper and effective parental care in the near future," *see id.* § 78A-6-507(1)(d)(iii). The juvenile court found that it was "strictly necessary" to terminate Mother's parental rights. *See id.* § 78A-6-507(1). After finding grounds for termination, the court concluded it was in the children's best interest that Mother's parental rights be terminated. *See id.* § 78A-6-503(12).

¶4 "Utah law requires a court to make two distinct findings before terminating a parent-child relationship." *In re R.A.J.*, 1999

UT App 329, ¶ 7, 991 P.2d 1118. "First, the court must find that the parent is below some minimum threshold of fitness, such as a finding that a parent is unfit or incompetent based on any of the grounds for termination" in section 78A-6-507. *Id.* (citation and internal quotation marks omitted). "Second, the court must find that the best interests and welfare of the child are served by terminating . . . parental rights." *Id.* Under Utah Code section 78A-6-507, the finding of a single ground will support termination of parental rights. *See id.* § 78A-6-507(1). The evidence supports the juvenile court's conclusion that Mother failed in her parental adjustment. Similarly, the evidence supports the findings under Utah Code section 78A-6-507(1)(d).

¶5    DCFS began working with Mother and her children in January 2014, after receiving numerous referrals for non-supervision and environmental neglect, as well as educational neglect of the oldest child, S.M. After two incidents of non-supervision in April 2015, DCFS filed a petition and expedited motion for temporary custody. Mother stipulated to the removal of the children. The juvenile court adjudicated the children as neglected by Mother. At the disposition hearing in May 2015, the juvenile court set a permanency goal of reunification with a concurrent goal of adoption. The court incorporated the Child and Family Plan into a court order, requiring Mother to maintain housing and employment, complete a psychological evaluation and follow any resulting recommendations, attend visits with the children, engage in family counseling, and participate in peer parenting.

¶6    Mother received diagnoses of bipolar disorder, dependent personality disorders, and parent–child relational problems. The psychological evaluation recommended that Mother obtain a medication evaluation, participate in individual therapy, participate in parenting training and family therapy, and participate in Parent-Child Interaction Therapy (PCIT) with S.M. Mother participated in individual therapy, but "she made

minimal progress and did not achieve any of her therapeutic goals." DCFS helped Mother obtain six months of medication for Mother while she was uninsured. Mother's mental health was noticeably better when she took her medication. In November 2015, Mother and S.M. began PCIT. Throughout the case, Mother had a difficult time keeping therapy appointments and often arrived late. In response, the providers switched to providing therapy in the evening after Mother's work, either at Mother's apartment or a nearby DCFS office. In April 2016, the juvenile court extended reunification services for an additional ninety days. Mother had a difficult time understanding and applying what she learned, but the therapist providing PCIT testified that towards the end of the reunification period, Mother was making a more concerted effort and was showing progress in PCIT therapy.

¶7     When S.M. came into DCFS custody, he exhibited severe ADHD symptoms and was not receiving medication. He was reactive and displayed emotional outbursts and aggressive behaviors. S.M. was placed in a proctor home, which is a specialized foster home that provides additional structure and training. The youngest child, Y.M., was also placed in this foster home. S.M. attended therapy and schooling for his behavioral issues and has an aide at school. When A.M. and L.M. came into DCFS custody, they had behavioral issues and had delayed language skills. Neither child reacted appropriately to being told "no," and they engaged in screaming fits. L.M. exhibited a "terrible temper," was verbally abusive, and used vulgar language. A.M. was submissive to L.M. These two children were placed in a separate foster home from their siblings and attended a specialized preschool. The foster families both provided mentoring and food assistance to Mother. The juvenile court found that the children's behavioral problems and developmental limitations at the time they were placed in DCFS custody were the direct result of Mother's neglect and poor parenting.

¶8 In May 2016, the juvenile court granted a stipulated motion for a trial home placement, which allowed Mother to participate in the peer parenting program. This involved only L.M. and A.M. being in the home for a half-day one time a week and all four of the children being in the home for a full day on the weekend. Thus, once the trial home placement was ongoing, Mother had the children in her home approximately one-and-a-half days of every week, which was when she was off work. Mother received peer parenting services after the children were placed in the home. The juvenile court found that Mother did not meet any of the peer parenting goals and was not able to implement the skills she was taught. Mother was never able to take care of the children on a full-time basis. Mother worked full-time from November 2015 through August 2016. Mother did not take appropriate steps to obtain day care that would have been necessary if she continued to work full-time and the children were returned to her.

¶9 On June 28, 2016, the peer parent and DCFS caseworker conducted a safety inspection of Mother's apartment in response to reports that the children were not safe. Mother had been told that the inspection would occur during a child and family team meeting earlier the same day. Upon seeing the dirty and unsafe condition of the home, the caseworker removed the children. The juvenile court found that Mother was solely responsible for the condition of her home on June 28, 2016, and that after more than a year of services, Mother remained unable to provide the children with a physically appropriate home. At a July 19, 2016 permanency hearing, the court found that returning the children to Mother's care would be detrimental to the children, that reunification was not feasible even within an additional ninety-day period, and that it was not in the best interest of the children to extend reunification services. The juvenile court terminated reunification services and changed the children's goal to adoption. After the termination of reunification services, Mother

did not maintain employment, engage in mental health counseling, take medications, or participate in parenting classes.

¶10  At trial, Mother asserted that her parental rights should not be terminated, arguing that the State had not met its burden to demonstrate parental unfitness. She argued that she was not unfit and was struggling with the demands of being a single parent to four children. Mother also contended that DCFS did not provide adequate assistance to her, frequently noting that Mother was not offered services in Spanish, that Mother did not receive reminders of her appointments, and that she was not assisted in making calls to professionals to whom she had been referred. Mother argues on appeal that the evidence was insufficient to support any of the grounds for termination or the best interest finding.

¶11  The juvenile court acknowledged that the requirements of the order for reunification and the Child and Family Plan "set a high bar" for Mother, noting that in a perfect world, Mother would have had the ability to be engaged full-time in learning how to care for her children while receiving mental health care. However, the court found that DCFS made reasonable efforts to accomplish the permanency goals. When the children came into DCFS custody, Mother "was wholly unable to supervise her children or to insure their physical safety or to provide them with a physically appropriate home." The juvenile court found that there was very little evidence that Mother had gained the skills despite the reasonable efforts of DCFS over a fifteen-month period. She was unable to provide a physically safe home, could not adequately supervise the children, and did not understand or address the need for structure and discipline. The court found that the children would not be safe if returned to Mother.

¶12  The evidence presented at trial was sufficient to provide a foundation for one or more grounds for termination, including failure of parental adjustment. Similarly, the juvenile court's

finding that it was in the best interest of the children to terminate parental rights to allow the children to be adopted into a home that will provide the structure and safety they need is supported by the evidence. Like the determination of unfitness, the best interests determination "should be afforded a high degree of deference." *In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435. Mother did not specifically challenge the adequacy of the foster placements, but the juvenile court expressed concern that none of the children were in prospective adoptive homes at the time of the termination trial. Nevertheless, the current foster parents were committed to providing homes for the children until prospective adoptive homes were identified. The juvenile court found that the children could not be safely returned to Mother and terminated her parental rights to free the children for adoption. The juvenile court's best interest determination is therefore supported by sufficient evidence.

¶13 Because "a foundation for the court's decision exists in the evidence," *see id.*, we affirm.

———————