**2017 UT App 153**

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF A.R. AND M.R.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

C.S.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20160326-CA
Filed August 17, 2017

Third District Juvenile Court, Salt Lake Department
The Honorable Mark W. May
No. 1108329

Liza M. Jones and Harini Venkatesan, Attorneys
for Appellant

Sean D. Reyes and John M. Peterson, Attorneys
for Appellee

Martha Pierce, Guardian ad Litem

JUDGE KATE A. TOOMEY authored this Opinion, in which JUDGES
MICHELE M. CHRISTIANSEN and JILL M. POHLMAN concurred.

TOOMEY, Judge:

¶1      C.S. (Mother) appeals the termination of her parental rights, challenging the constitutionality of a statute invoked in this case and arguing that the evidence was insufficient to support termination. She also raises a due process challenge. We affirm.

BACKGROUND

¶2     Mother has two daughters, one born in March 2008, and the other in June 2009.[1] In December 2014, the Division of Child and Family Services (DCFS) filed a verified petition alleging that the children were "abused, neglected and/or dependent." The heart of the petition as it related to Mother was that she was using methamphetamine, sometimes in the children's presence. Following a shelter hearing during which both parents were present and represented by counsel, the juvenile court gave DCFS temporary legal custody and physical custody of the children.

¶3     The matter progressed to an adjudication hearing in January 2015, and the juvenile court found by clear and convincing evidence that the petition was true. Mother "has a current substance abuse addiction that negatively affects her parenting abilities." Based on this, the court concluded the children were "neglected by mother" and "dependent child[ren] as to father." It ordered the children into DCFS custody for community placement and ordered DCFS to create a plan to address their needs. It authorized Mother to have supervised visits and ordered her to submit to a substance abuse assessment and random drug screens and to contact DCFS "at least once a week." Both parents attended this hearing, with counsel.

¶4     The court conducted a disposition hearing as to Mother in February 2015. It found that DCFS's service plan "constitutes reasonable efforts on the part of [DCFS] to reunify the mother with her children." The children continued in DCFS custody, with a permanency goal of "reunification with a concurrent goal of adoption." Later that month, the court conducted another disposition hearing in which it found that "reunification services

---

1. Their father is J.S.R. (Father). His case is addressed in a related appeal. *See In re A.R.*, 2017 UT App 154.

for the father [were] not detrimental to the children" and ordered "DCFS to provide reasonable reunification services for the father and children." During that hearing, the court also "authorize[d] a trial home placement with the mother once approved by the child and family team."[2]

¶5    A review hearing in August 2015, which Mother did not attend, resulted in the court rescinding the order for trial home placement. After that, DCFS filed a verified petition for seeking termination of parental rights as to both parents, alleging among other things, that Mother had stopped attending therapy through her initial program, and although she was referred to a second program, had failed to attend the required sessions there. Additionally, she missed a dozen urine tests, refused one test, and at another time tested positive for cocaine and methamphetamine.

¶6    The termination of parental rights petition proceeded to trial beginning in December 2015 and intermittently continued into April 2016. In total, there were eleven days of trial over approximately four months. Between the first and second days of trial, Mother was arrested. In mid-January, DCFS moved to amend its petition on the ground that "[c]ircumstances regarding the parents have changed in the nearly four months since the State filed its petition." The new allegations included Mother's early January arrest for driving under the influence and other crimes. Mother opposed the motion to amend the petition, but the court permitted it, although "[t]o ensure due process," the court granted "defense counsel additional time to address the new allegations."

¶7    The court ultimately terminated Mother's parental rights. It found that (1) she "failed to successfully comply with the

_____

2. During a subsequent review hearing, the court "authorize[d] a trial home placement upon approval of the Guardian ad Litem."

Court's orders and her Service Plan"; (2) "[t]he children cannot be safely returned to [Mother]"; (3) "[she] is an unfit parent" due to her addiction to and use of controlled substances, which was the reason she initially lost custody of the children, and "[i]ndeed, [Mother] is in need of treatment at a higher level of care at the end of the termination trial than what she needed at the beginning"; (4) she "is also an unfit parent because of her continued criminal activity," including five arrests and incarcerations while the case was pending, three of which were "during the course of the termination trial"; (5) Mother "has not remedied the reasons for the removal of her children and there is a substantial likelihood that [she] will not be capable of exercising proper and effective parental care in the near future"; (6) Mother "has had a failure of parental adjustment" and "has been unwilling or unable within a reasonable time to substantially correct the circumstances, conduct, or conditions that led to placement of her children outside of her home" despite DCFS's "reasonable and appropriate efforts to provide services to [Mother]"; and (7) Mother "has made only token efforts to support her children."

¶8    Based on its findings, the juvenile court concluded that Mother neglected the children and was an unfit parent, justifying termination of her parental rights, and that she

> ha[d] substantially neglected, willfully refused or has been unable or unwilling to remedy the circumstances that caused the children to be in an out-of-home placement and there is a substantial likelihood that [Mother] will not be capable of exercising proper and effective parental care in the future, justifying termination of her parental rights.

All of this, combined with her "failure of parental adjustment" and "only token efforts to support" the children, justified termination. The juvenile court also concluded that termination would be in the children's best interests. Accordingly, it terminated Mother's parental rights. Mother appeals.

## ISSUES AND STANDARDS OF REVIEW

¶9     Mother raises three issues on appeal. First she contends the court erred by admitting hearsay statements under an unconstitutional statute. We review constitutional issues for correctness. *See In re L.M.*, 2013 UT App 191, ¶ 5, 308 P.3d 553. Second, Mother contends the court violated her right to due process. Whether "a parent has been afforded adequate due process is a question of law, reviewed for correctness." *In re Z.Z.*, 2013 UT App 215, ¶ 9, 310 P.3d 772 (citation and internal quotation marks omitted). Third, Mother contends there was insufficient evidence for the court to make a number of its findings. "Whether a parent's rights should be terminated presents a mixed question of law and fact." *In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435. "Because of the factually intense nature of such an inquiry, the juvenile court's decision should be afforded a high degree of deference." *Id.* "Thus, in order to overturn the juvenile court's decision the result must be against the clear weight of the evidence or leave the appellate court with a firm and definite conviction that a mistake has been made." *Id.* (brackets, citation, and internal quotation marks omitted).

## ANALYSIS

### I. Any Error in Admitting the Hearsay Statements Was Harmless.

¶10   Mother's first contention involves several hearsay statements that the children's foster mother (Foster Mother) made during her testimony at trial. Foster Mother testified regarding the children, their adjustment and behaviors, and her experience with them. She also testified to several statements the children made to her, including that they feel safe in her care, that they want to live with the foster family but feel guilty about not living with Mother, and that they worry about Mother when she misses her visits with them. Mother argues the juvenile court

erred in allowing testimony of the children's statements because the statements were inadmissible hearsay.

¶11 Under Utah Code section 78A-6-115, hearsay statements from children under eight years old are admissible if they are made "to a person in a trust relationship" for "the purpose of establishing the fact of abuse, neglect, or dependency." Utah Code Ann. § 78A-6-115(6) (LexisNexis 2012). The juvenile court determined the children had a trust relationship with Foster Mother and allowed the statements. On appeal, Mother raises a number of issues challenging the constitutionality of this statutory provision.

¶12 We do not address this constitutional issue because, even if the court erred by admitting the hearsay statements, we determine that any error in admitting such evidence was harmless. *Cf. In re I.M.L.*, 2002 UT 110, ¶ 9 n.3, 61 P.3d 1038 ("Generally, we avoid reaching constitutional issues if a case can be decided on other grounds."); *In re W.A.*, 2002 UT 127, ¶ 46, 63 P.3d 607 (declining to address the constitutionality of a statute where the court could affirm the termination of parental rights on other grounds). Harmless error "is an error that is sufficiently inconsequential that there is no reasonable likelihood that it affected the outcome of the proceedings." *H.U.F. v. W.P.W.*, 2009 UT 10, ¶ 44, 203 P.3d 943 (citation and internal quotation marks omitted).

¶13 We see no reasonable likelihood that these three hearsay statements affected the outcome of the proceedings. In terminating Mother's parental rights, the juvenile court elaborated on five different termination grounds, *see infra* ¶ 40, concluded that termination was in the children's best interests, *see infra* ¶¶ 44–46, and additionally concluded DCFS had provided Mother with reasonable reunification efforts, *see infra* ¶¶ 47–51. The children's statements would have had limited effect on the five grounds of termination and no effect on the court's decision that Mother received reasonable reunification efforts. And while these statements could have informed the

court's decision that termination was in the children's best interests, due to the overwhelming amount of other evidence supporting that decision, we conclude there is no reasonable likelihood the statements affected this outcome.

¶14 First, Foster Mother testified that the children stated they felt safe in her care. This statement was harmless because other substantial evidence conveyed the same fact. For example, Foster Mother testified that when the children first came into her care, they were "terrified" and would "yell and scream and run away or just outright panic." But eventually they became "much more peaceful and calm" and "a lot more open in how they're feeling." The children's behavior changed significantly over time—their defiant, aggressive, and anxious behaviors diminished. They turned to Foster Mother for comfort, even when Mother was present, and they confided in Foster Mother. Given this evidence, which demonstrates their sense of security with Foster Mother, there is no reasonable likelihood the hearsay statement that the children felt safe with Foster Mother changed the outcome of the court's decision.

¶15 Likewise, there is no reasonable likelihood the children's other statements—that they worried about Mother when she missed visits and that they wanted to stay with their foster family but felt guilty about Mother—changed the outcome of the court's decision. The statements demonstrate that Mother's behavior caused the children anxiety, and they were torn between her and their foster family. The court may have relied on this evidence in determining that the children were anxious about choosing with whom to live and in finding that the children have a strong bond with Mother, which was "holding the girls back from fully committing to the foster parents where they can have a drug free, crime free and stable home that [Mother] cannot provide." But even if this was error, the remaining evidence supporting the court's decision was so substantial that the ultimate outcome would have been the same. *See infra* ¶¶ 44–46.

¶16   For example, the juvenile court determined the children's behavior had changed significantly since they entered Foster Mother's care. When they arrived, they were defiant, aggressive, and anxious, but these behaviors subsided as the foster family provided "patience, consistency, structure and routines." The foster parents were well adapted to dealing with difficult behaviors because many of their own children have special needs. They spent substantial time with the children on schoolwork, and both children improved academically. In addition, the children were regularly attending therapy, they were bonded to Foster Mother, and the foster family was willing to adopt them. In contrast, the court determined that Mother had continued the behaviors that initially caused her to lose custody of her children. Though Mother had made some progress, she required a higher level of treatment at the end of the termination trial than she did at the beginning. Throughout the proceedings, Mother's positive drug tests and incarcerations interrupted her drug treatment, and the incarcerations caused her to miss visits with the children. Furthermore, Mother often failed to engage with the children during visits, and Foster Mother reported a decline in the children's emotional state when Mother was given additional visitation. Because overwhelming evidence supports the court's decision that termination was in the best interests of the children, we conclude that the children's statements concerning their anxiety over Mother did not change the outcome of the court's decision. Thus, any error in admitting the hearsay evidence and the brief mention of that evidence in the court's findings was harmless. [3]

---

3. Mother cites *In re L.M.*, 2013 UT App 191, 308 P.3d 553, in support of her argument that this statute is unconstitutional. In that case, this court acknowledged that the Utah Constitution permits the legislature to amend the Utah Rules of Evidence, but it also noted that "this provision explicitly granting the legislature the power to amend the rules of evidence was adopted one year *after* the hearsay exception was promulgated."

(continued…)

II. Mother's Right to Due Process Was Not Violated.

¶17    Mother contends her right to due process was violated in four different ways: (1) the juvenile court "allowed the State to amend its termination petition" during trial, (2) the court erred in its "determinations of witness credibility," (3) the court considered "excluded allegations of prostitution" in its order, and (4) Mother "was forced to proceed with her case before the State had rested its own case." We address each of these contentions in turn.

A.    Amendment to the Termination Petition

¶18    Trial commenced in December 2015, and continued intermittently over eleven days between then and April 2016. On January 3, between the first and second days of trial, Mother was arrested. This prompted the State to file a motion for leave to amend the verified petition, which the juvenile court granted. The amended petition stated that Mother had been arrested and incarcerated for driving under the influence and for other crimes.

¶19    Mother contends this amendment violated her right to due process. She argues it should not have been allowed under Rule 15(d) of the Utah Rules of Civil Procedure because the State attempted to introduce evidence that had not yet been pleaded, denying Mother "proper or adequate notice." She also argues some evidence introduced amounted to expert opinion, and because she "did not receive proper or adequate notice" of this

_____

(…continued)
*Id.* ¶ 3 n.3. Because the parties in that case did not address what effect that fact may have had on the "propriety of the hearsay exception," this court declined to consider the matter. *Id.* We likewise do not address this issue because any error that occurred in admitting the children's hearsay statements was harmless.

evidence, she was prevented from presenting an effective defense. Finally, Mother argues her right to due process was violated because "it could not be said 'justice requires' the amendment." *See* Utah R. Civ. P. 15(a)(2). But we see no error in the court's decision allowing the verified petition to be amended to include events that occurred during the course of trial.

¶20   Rule 15(b)(2) of the Utah Rules of Civil Procedure provides:

> If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended. The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits. The court may grant a continuance to enable the objecting party to meet the evidence.

¶21   At trial, the State attempted to present evidence of Mother's January 3 arrest, which was an issue not raised in the verified petition. Mother objected on the basis that current criminal charges had not been pleaded. The court allowed the testimony and later allowed the State to amend its verified petition to include Mother's January 3 arrest and incarceration and the current charges against her.

¶22   The court's action comported with the requirements of rule 15(b). It noted that the amended petition contained "new and relevant" information concerning Mother, which "would be important information for the Court in its determination of whether [Mother] is unfit and whether it is in the children's best interest to terminate parental rights." In her motion in opposition, Mother argued that her defense would be prejudiced by the new information because she had not been provided adequate discovery about the most recent charges. But during

trial, the court addressed these concerns and allowed Mother time to request additional discovery. Further, in its order and during trial, the court stated it would allow more time for Mother to address these allegations: "To ensure due process, the Court will grant defense counsel additional time to address the new allegations." Finally, if Mother was given insufficient notice of expert opinion, any prejudice would have been cured by the additional time granted to Mother to meet the new allegations.

¶23　The court determined that the new information would aid its decision on the merits and resolved Mother's prejudice concern by allowing time for Mother to meet the allegations. Moreover, because an amendment should be "freely permit[ted]" under these circumstances, there was no error in the decision to allow the State to amend its petition. *See* Utah R. Civ. P. 15(b)(2).

B.　Determinations of Witness Credibility

¶24　Mother next argues the juvenile court erred in its determinations of witness credibility. Specifically, she asserts the court made credibility determinations only as to Mother and Father, and not as to the other witnesses, and this shows the court "assumed a parent at a termination trial is inherently not credible." Mother also asserts the court erred in its determination that part of her testimony was not credible.

¶25　"Because determinations regarding the weight to be given to the testimony of witnesses . . . are within the province of the finder of fact, we will not second guess a court's decisions about evidentiary weight and credibility if there is a reasonable basis to support them." *Barrani v. Barrani*, 2014 UT App 204, ¶ 6, 334 P.3d 994. Thus, we will reverse a juvenile court's credibility determination only if its findings in support of the determination are against the clear weight of the evidence. *Id.*

¶26　First, Mother argues the juvenile court made credibility determinations only as to herself and Father and failed to make a

credibility determination as to Foster Mother. But courts are not required to make a credibility finding for each witness, s*ee In re Adoption P.K.M.*, 628 P.2d 1286, 1289 (Utah Ct. App. 1981), "[r]ather, the findings of ultimate facts implicitly reflect consideration of the believability of the witnesses' testimony," *id.* The fact that the court made specific determinations only as to Mother and Father does not demonstrate that it "assumed a parent at a termination trial is inherently not credible," as Mother claims.

¶27 Second, Mother argues the court's credibility determination regarding a particular portion of her testimony was against the clear weight of the evidence. The court noted that Mother claimed she was arrested for theft in Idaho and spent two weeks in jail as a result, but it found her explanation for her time in jail not credible. Mother asserts the court's determination was clearly erroneous because a DCFS witness also testified that Mother was incarcerated for theft. But Mother does not provide a citation to this witness's testimony and does not provide any other basis for why the court's determination was against the clear weight of the evidence. *See Tobler v. Tobler*, 2014 UT App 239, ¶ 44, 337 P.3d 296 (stating that it is "not an appellate court's burden to 'comb the record for evidence' in support of an appellant's arguments" (quoting *Tanner v. Carter*, 2001 UT 18, ¶ 19, 20 P.3d 332)). The court found that "[t]hroughout her testimony in the termination trial, [Mother] was not a credible witness." And there is a reasonable basis to believe that her testimony was inherently implausible—the court indicated its skepticism that Mother would have spent two weeks in jail for merely stealing a pair of shoes. We therefore decline to conclude the court abused its discretion in making this credibility determination.

C.    Consideration of Prostitution Allegations

¶28 Mother argues that the juvenile court considered excluded allegations that she participated in prostitution and that this violated her right to due process. Mother alleges that

she twice objected to evidence of prostitution on the basis that the petition had not alleged it and that the court considered details of the evidence before it decided whether it would be admitted. Though the court ultimately decided the evidence of prostitution would not be admitted, Mother argues the court referred to the excluded evidence in one of its findings of fact. It stated:

> Sometime after her January 3, 2016, DUI arrest, [Mother] was arrested in Idaho. [Mother] claimed she was arrested for petty theft for stealing a pair of shoes from a [sporting goods] store and that as a result of her arrest, she spent two weeks in jail in Idaho. [Mother] admitted she was in Idaho with a friend . . . who was arrested for prostitution. [Mother] testified there was a posting on [a local webpage] under her phone number in the escort services section that said: "Hi, I'm back poking[4] and I brought a friend." [Mother] testified the message was in relation to the Idaho trip and she was not sure if she or her friend wrote it. While this Court cannot find that [Mother] was engaged in prostitution in Idaho, it does find that her explanation that she spent two weeks in jail for stealing a pair of shoes—is not credible.

¶29 Even if the juvenile court erred in admitting and considering evidence relating to prostitution, or erred by considering excluded evidence relating to prostitution, we conclude that any error was harmless.

---

4. Mother alleges the court misquoted the online posting in its findings of fact. According to Mother's testimony at trial the post actually read, "Hi, guys, I'm back in Poci, and I brought a sexy friend." Mother also alleges that Poci is an abbreviation for Pocatello, Idaho.

¶30    First, while the court's finding demonstrates there was evidence connecting Mother to prostitution, it explicitly states, "this Court cannot find that [Mother] was engaged in prostitution in Idaho." Mother argues that with this finding "the Court is essentially saying Mother was incarcerated for prostitution." (Emphasis omitted.) But the actual wording of the juvenile court's findings contradicts this assertion.

¶31    Second, as stated above, the two central reasons for terminating Mother's parental rights were her habitual use of controlled substances and her continued criminal activity. Neither of these reasons involved the prostitution allegation. Because the court stated it could not find that Mother had been incarcerated for prostitution, and because there were numerous other instances of drug use and criminal behavior, there is no reasonable likelihood that the potential error of admitting and considering evidence relating to prostitution had any effect on the termination of Mother's parental rights. *See H.U.F. v. W.P.W.,* 2009 UT 10, ¶ 44, 203 P.3d 943.

D.    Order of Presentation at Trial

¶32    Lastly, Mother argues her right to due process was violated when she "was forced to proceed with her case before the State had rested its own case." Mother also alleges she was forced to cross-examine the State's witnesses when the State had not provided relevant discovery.

¶33    Mother's argument on this issue is less than two paragraphs long. Although there may have been error in the timing and manner in which Mother was required to present her case, she does not explain how these errors affected her rights beyond the conclusory statements that she did not "receive a fundamentally fair trial process and her constitutional right to due process was violated." An error is harmless if it is "sufficiently inconsequential that there is no reasonable likelihood that it affected the outcome of the proceedings." *H.U.F.,* 2009 UT 10, ¶ 44 (citation and internal quotation marks

omitted). Mother has not demonstrated how having to present her case before the State had closed its own case affected the court's decision in terminating Mother's parental rights.

¶34 Additionally, Mother claims that her right to due process was violated because she had to cross-examine witnesses without relevant discovery provided by the State. But Mother has not explained how having additional discovery during cross-examination would have affected the outcome of the trial.

¶35 Due to the shortcomings of her brief, Mother has failed to carry her burden of persuasion on appeal. *See State v. Roberts*, 2015 UT 24, ¶ 18, 345 P.3d 1226 (explaining that the adequacy of a party's briefing under Rule 24 of the Utah Rules of Appellate Procedure "is a natural extension of an appellant's burden of persuasion" (citation and internal quotation marks omitted)). Therefore, we conclude that any error was harmless, and Mother's right to due process was not violated.

¶36 Nevertheless, we cannot endorse the manner in which the State presented its case. The juvenile court stated

> that the State has been, frankly, lackadaisical in providing discovery. . . . I lay the delays in this trial at their feet. [Assistant Attorney General], you haven't taken this as seriously as I think you should have. And I don't think that you have provided discovery as timely as . . . you should have done.

Our review of the record supports this rebuke. Many times during trial, the State provided discovery late, or tried to examine its witnesses with materials it had never provided to the opposing parties. Counsel for Mother and Father sometimes did not have access to the documents the State used to question witnesses until after direct examination was completed. The State called witnesses who were not listed on its witness list. The State also amended its petition in the midst of trial, and though

the petition contained new information as to Mother, the information it added as to Father was not newly discovered. And even after amending its petition, the State attempted to present evidence that had never been pleaded.

¶37 Although the State's conduct is troubling, we conclude that these many errors did not affect the outcome of the proceedings with regard to Mother.

### III. Sufficient Evidence Supports the Juvenile Court's Termination of Mother's Parental Rights.

¶38 Mother's final contention is that the court lacked sufficient evidence to make a number of its determinations, including that (1) she was an unfit parent, (2) the termination of her parental rights was in the children's best interests, (3) DCFS provided reasonable efforts to reunify the children with Mother, and (4) reunification could not be extended by ninety days.

¶39 "[I]n order to overturn the juvenile court's decision the result must be against the clear weight of the evidence or leave the appellate court with a firm and definite conviction that a mistake has been made." *In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435 (brackets, citation, and internal quotation marks omitted). Further, when "a foundation for the court's decision exists in the evidence, an appellate court may not engage in a reweighing of the evidence." *Id.*

### A. Mother as an Unfit Parent

¶40 The juvenile court terminated Mother's parental rights based on five different grounds: (1) Mother was an unfit parent because of her habitual or excessive use of controlled substances; (2) Mother was an unfit parent because of her continued criminal activity; (3) Mother was unable or unwilling to remedy the circumstances that caused her children to be in an out-of-home placement under DCFS and court supervision, and there was a substantial likelihood she would not be capable of exercising

proper and effective parental care in the near future; (4) Mother had a failure of parental adjustment; and (5) Mother made only token efforts to support her children. *See* Utah Code Ann. § 78A-6-507(1)(c)–(f) (LexisNexis 2012); *id.* § 78A-6-508(2)(c) (LexisNexis Supp. 2016).

¶41 Mother challenges all five grounds, asserting there was insufficient evidence for the court to terminate her rights on each. But Mother acknowledges the court need only find one ground in order to terminate parental rights. *See id.* § 78A-6-507(1) (listing numerous circumstances and stating "the court may terminate all parental rights with respect to a parent if the court finds any one" of the listed circumstances). Because we conclude the juvenile court had sufficient evidence to terminate Mother's rights on one ground, we need not analyze the sufficiency of the evidence on other grounds.

¶42 Mother argues the court lacked sufficient evidence to conclude she was unfit on the basis of her "habitual or excessive use of intoxicating liquors, controlled substances, or dangerous drugs that render the parent unable to care for the child." *See id.* § 78A-6-507(1)(c), -508(2)(c). She also contests the court's determination that she was driving under the influence on January 3.

¶43 Aside from that particular determination, the juvenile court's decision was based on substantial evidence that Mother's habitual use of controlled substances rendered her unable to care for her children. In its ruling, the court explained that Mother originally lost custody of the children because of her methamphetamine use. Mother tested positive for methamphetamine in March 2015, August 2015, and during the termination trial on January 11, 2016. She also missed eighteen of forty-two drug tests throughout the case. In addition, Mother had not completed her drug treatment and needed a higher level of treatment at the end of the termination trial than she did at the beginning of the termination proceedings, suggesting that her condition was deteriorating rather than improving. Finally,

Mother testified that when she is under the influence of illegal drugs, she cannot properly parent her children, and she also testified that she believed she could "kick" her methamphetamine use without treatment, which belief the juvenile court concluded "demonstrates [Mother's] lack of insight into her drug addiction." Thus, the evidence supports the juvenile court's decision to terminate Mother's rights on the basis of unfitness. *See id.* § 78A-6-508(2)(c) (stating that a court must consider the "habitual or excessive use of . . . controlled substances, or dangerous drugs that render the parent unable to care for the child" when determining whether a parent is unfit).

B.      Best Interests of the Children

¶44     Mother next contends there is insufficient evidence for the court to conclude that termination of her parental rights was in the best interests of her children.

¶45     Mother argues that many of the court's determinations regarding the children's best interests were based on Foster Mother's testimony and alleges "Foster Mother's credibility is of concern." Mother points to Foster Mother's testimony that she had never posted pictures of the children or information about the case on social media. Cross-examination revealed that Foster Mother had posted one picture in which the backs of the children were in the image and that another post mentioned she was at the termination trial. Although this shows some inconsistency in Foster Mother's testimony, it is not enough to demonstrate that the court's reliance on her testimony was misplaced. *See Barrani v. Barrani*, 2014 UT App 204, ¶ 6, 334 P.3d 994 ("Because determinations regarding the weight to be given to the testimony of witnesses . . . are within the province of the finder of fact, we will not second guess a court's decisions about evidentiary weight and credibility if there is a reasonable basis in the record to support them."). These minor inconsistencies in Foster Mother's testimony do not persuade us to second-guess the court's reliance on her testimony.

¶46 The court's decision that termination was in the children's best interests was well supported. First, it determined the children had behavioral difficulties when they were first placed with Foster Mother and were behind in school. Further, both children lacked basic hygiene skills.[5] Foster Mother's home provided consistency and structure, and the children attended weekly therapy. Their behavior improved, and they made significant academic progress. But after their visitation with Mother increased, their emotional states declined and their past behaviors returned. While the children demonstrated a strong bond with Mother, they had also bonded with Foster Mother and looked to her for comfort.[6] Finally, the foster parents treated

_____

5. Mother argues the children spent time in a different foster placement and in a group home before they were placed with Foster Mother. She asserts it "is highly probable that the behaviors the children displayed when they went to the current foster placement could be attributed to the sub-care they received when they initially came into DCFS custody." But the severity of the behaviors and conditions exhibited by the children—complete lack of good hygiene and serious anxiety—and the degree to which the children were behind in school suggest these behaviors developed before the children's placement with the group home, while in Mother's care.

6. The juvenile court determined that the children's bond with Mother was "holding the girls back from fully committing to the foster parents where they can have a drug free, crime free and stable home that [Mother] cannot provide." Mother challenges this determination, asserting it is "wholly inappropriate" "to sever[] ties with the natural parent so that a child can potentially bond with a potential adoptive placement." (Emphasis omitted.) Even had the court made this determination in error, however, there is still sufficient evidence supporting the court's decision that terminating Mother's parental rights was in the children's best interests.

the children as their own and were willing to adopt them. Given this evidence, we conclude the juvenile court's determination that the termination of Mother's parental rights was in the best interests of the children had sufficient support.

### C.     Reasonable Reunification Efforts

¶47    Next, Mother contends the evidence was insufficient to support the court's determination that DCFS made reasonable reunification efforts. Except as provided by statute, "in any case in which the court has directed the division to provide reunification services to a parent, the court must find that the division made reasonable efforts to provide those services before the court may terminate the parent's rights." Utah Code Ann. § 78A-6-507(3)(a) (LexisNexis 2012). "The juvenile court has broad discretion in determining whether DCFS has made reasonable efforts at reunification." *In re M.D.*, 2014 UT App 225, ¶ 5, 336 P.3d 585 (brackets, citation, and internal quotation marks omitted). To comply with this statutory obligation, DCFS must make "a fair and serious attempt to reunify a parent with a child prior to seeking to terminate parental rights." *Id.* (citation and internal quotation marks omitted).

¶48    Mother asserts she did not receive reasonable reunification efforts because the help she received from her caseworker was inadequate, DCFS did not "explore funding options for [Mother]'s treatment," and it did not help her develop a daycare plan or provide her with an updated service plan.

¶49    We conclude DCFS provided reasonable reunification services to Mother. First, with assistance from DCFS, Mother began therapy in a drug treatment program, which was funded by the county. After missing several drug tests and group treatment sessions, Mother voluntarily left the program but did not inform DCFS that she had done so. When DCFS learned she was no longer in treatment, the caseworker contacted Mother and informed her she needed to obtain a new substance abuse

assessment to receive a recommendation for a new program. Mother's incarceration delayed her enrollment in a new program. When Mother did enroll, she learned that county funding was available, but the waiting list to receive such funding was approximately nine weeks. To her credit, Mother opted to self-pay so she could begin treatment. But later, because of her continued drug use and incarcerations, the level of treatment Mother needed increased, and she could no longer afford to self-pay. In response to this situation, DCFS helped Mother locate a new drug treatment program. This demonstrates Mother received continual help from her caseworker, including help with funding.

¶50 Furthermore, DCFS arranged for drug and alcohol assessment, supervised visitation, conducted drug testing, held child and family team meetings, and maintained consistent communication with Mother. This demonstrates DCFS's serious and sustained efforts to reunite Mother with her children.

¶51 Finally, Mother alleges DCFS did not help her develop a daycare plan, but this was not a requirement of Mother's service plan, and Mother has not shown how this deficiency alone would cause the reunification services to be unreasonable. Also, Mother alleges DCFS was required to provide her with an updated service plan, but she cites no authority to support this and has not provided record citations. Thus, we decline to address this issue. *See State v. Roberts*, 2015 UT 24, ¶ 18, 345 P.3d 1226. In sum, there is sufficient evidence supporting the court's determination that DCFS provided reasonable reunification services.

D.    Reunification Extension

¶52 Mother's last contention is that the juvenile court lacked sufficient evidence to determine that reunification services could not be extended by ninety days.

¶53   According to statute, a court "may extend reunification services for no more than 90 days" if it determines by the preponderance of the evidence that "(i) there has been substantial compliance with the child and family plan; (ii) reunification is probable within that 90-day period; and (iii) the extension is in the best interest of the minor." Utah Code Ann. § 78A-6-314(7)(a) (LexisNexis Supp. 2016). Mother argues she met all three conditions by a preponderance of the evidence, and therefore "there was insufficient evidence for the Court to make permanency findings denying [Mother] an extension of reunification service."

¶54   But this statutory language is discretionary, not mandatory. If all three conditions are met, a court is not required to extend reunification services; rather, it "*may* extend" the services. *See id.* (emphasis added). Furthermore, Mother received services throughout the period she requested. "The time period for reunification services may not exceed 12 months from the date that the minor was initially removed from the minor's home, unless the time period is extended . . . ." *Id.* § 78A-6-312(13)(a). Additionally, reunification services may not last "beyond 15 months after the day on which the minor was initially removed from the minor's home." *Id.* § 78A-6-314(7)(b)(i). The children were removed from Mother's custody on December 5, 2014, and the fifteen month deadline, which would include the ninety-day extension, expired on March 5, 2016. During the termination trial on January 14, 2016, the court stated, "[U]ntil I determine otherwise, I'm going to have the Division continue to provide services." After Mother left her second drug treatment program in March 2016, DCFS helped her find and enroll in a new treatment program, which Mother initiated on March 7, 2016. Given this evidence, there is no merit to Mother's argument that she did not receive a ninety-day extension for reunification services because Mother received services throughout the termination trial, past the fifteen-month statutory deadline. We therefore determine there is no error to review.

CONCLUSION

¶55    For the foregoing reasons, we affirm the decision of the juvenile court.

―――――――――