2004 UT App 120

**STATE of Utah, in the interest of L.N. and S.N., persons under eighteen years of age.**

**L.N., Appellant,**

v.

**State of Utah, Appellee.**

**No. 20030449–CA.**

Court of Appeals of Utah.

April 22, 2004.

Jere Reneer and Lee Fisher, Reneer & Associates, Spanish Fork, for Appellant.

Mark L. Shurtleff, atty. gen., and John M. Peterson, asst. atty. gen., Salt Lake City, for Appellee.

Martha Pierce and Paul Waldron, Salt Lake City, Guardians Ad Litem.

Before BENCH, Associate P.J., GREENWOOD and ORME, JJ.

## OPINION

BENCH, Associate Presiding Judge:

¶ 1 After a three-day trial, the juvenile court substantiated that Father, by a preponderance of the evidence, had sexually and emotionally abused his son, L.N. The court also found, by clear and convincing evidence, that L.N. and his sister, S.N., remained neglected and emotionally abused children. We affirm.

## BACKGROUND

¶ 2 L.N., a six-year-old male child, and S.N., a three-year-old female child, come from a family with a lengthy history of involvement with the Division of Child and Family Services (DCFS). A domestic violence worker from DCFS counseled L.N. and S.N.'s mother for several months before the State sought, and received, an order of protective supervision over L.N. based upon allegations of domestic violence perpetrated by

Father.[1] After obtaining jurisdiction, the juvenile court directed Father to comply with the requirements of his service plan, but Father refused to cooperate. The court terminated jurisdiction because Father's refusal rendered DCFS's attempted intervention meaningless. Later, DCFS was again alerted to an allegation of domestic violence in the home. The State obtained an investigative subpoena to interview L.N. at the Children's Justice Center (the CJC). The State once again sought protective supervision, this time over both L.N. and S.N. The parents admitted to engaging in domestic violence in front of the children, and Father admitted to using inappropriate discipline with L.N. The juvenile court assumed jurisdiction over the family once again.

¶ 3 Later, L.N. told intern therapist, Nancy Coyne, that Father made L.N. touch Father's "private parts." L.N. said that the touching happened a lot and that it made him feel bad. During play therapy, L.N. showed Ms. Coyne a penis on one of the dolls and explained to Ms. Coyne that penises grow and then melt. Because of these disclosures, DCFS began an investigation that culminated in L.N.'s removal into protective custody. After his removal, L.N. was seen by physician assistant, Bret Davis. L.N. told Mr. Davis that Father touched L.N.'s genital region "with a stick." L.N. also disclosed to Mr. Davis that sometimes Father touched his penis to L.N.'s "peepee area." Mr. Davis did not find any physical evidence of sexual abuse.

¶ 4 L.N. was again interviewed at the CJC. This interview was videotaped. Before trial, the State filed a motion in limine seeking to introduce L.N.'s videotaped interview at the CJC as well as a videotape from an interview between L.N. and Ms. Coyne. The court ruled that the videotapes were not sufficiently trustworthy to be admitted for the truth of the matter asserted, but that the tapes were admissible to show L.N.'s mental state. Based upon L.N.'s conduct in the videotapes, the court further ruled that L.N. was un-

available as a witness because he would be traumatized if required to testify.

¶ 5 At trial, L.N.'s shelter mother, Michelle, and foster mother, Kari, both testified. The court found that hearsay statements made by L.N. to Michelle and Kari were admissible pursuant to Utah Code Annotated section 78–3a–116(5) (2002) as "statements made by a minor under eight years of age to a person in a trust relationship." *Id.*

¶ 6 Michelle testified that L.N. shared many of his feelings with her, and that he was very huggable and loveable. After having lived in Michelle's home for only a short time, L.N. told her "my dad likes me to be naked." He also told Michelle that "my dad touches my parts." When Michelle asked him how the touching made him feel, he responded "scared." Both S.N. and L.N. said, "My dad hurts me. My dad hits me." Additionally, L.N. made disclosures unrelated to abuse. Michelle testified that when L.N. felt sad, he would say, "I'm feeling very sad," or "I miss my mom." In Michelle's view, L.N. did not seem tentative or fearful to share his feelings, and he sought comfort from her. The court asked Michelle whether she thought L.N. was confiding in her when he made the disclosures about Father, and she answered affirmatively.

¶ 7 Kari told the court of a time when she found L.N. in a bedroom with S.N. She could hear L.N. "talking and giggling and laughing." When she entered his room, she found him leaning over S.N. who was half-naked. L.N. then ran and hid in his closet. Kari asked L.N. what they were doing and L.N. told Kari that they were "playing the naked game." Kari then changed S.N.'s diaper. The diaper was completely undone and only halfway on. Kari found a mark on S.N.'s upper inner thigh. Kari asked S.N. how she got the "owie," and S.N. told her that she got it "from the game." Kari asked L.N. where he learned the game. L.N. answered, "My dad. We played it in the living room." Kari asked him how he felt when he played that game, and he said, "Uncomfortable."

---

1. The order of protective supervision only extended to L.N. because S.N. had not yet been born.

¶ 8 At the close of trial, the court found, by clear and convincing evidence, that the children remained neglected and emotionally abused. Additionally, the court found, by a preponderance of the evidence, that L.N. had been a victim of sexual abuse at the hands of Father, and that DCFS's findings of sexual and emotional abuse were substantiated.[2] Father appeals.

## ISSUES AND STANDARDS OF REVIEW

¶ 9 Father asserts that the trial court erred in permitting the CJC videotaped interview to be used to show the mental state of L.N., while denying Father the opportunity to use the videotape to demonstrate that L.N. did not understand the difference between reality and fantasy. "A trial court has broad discretion to admit or exclude evidence and its determination typically will only be disturbed if it constitutes an abuse of discretion." *In re S.A.K.*, 2003 UT App 87,¶ 9, 67 P.3d 1037 (quotations and citations omitted).

¶ 10 Father next contends that the trial court failed to analyze the unreliability of L.N.'s statements, due to L.N.'s incompetence, pursuant to Utah Rule of Evidence 403. " 'A trial court's decision to admit evidence under rule 403 of the Utah Rules of Evidence is reviewed for an abuse of discretion.' " *State v. Fedorowicz*, 2002 UT 67,¶ 35, 52 P.3d 1194 (citation omitted).

¶ 11 Father also argues that Michelle's testimony of what L.N. had told her was hearsay, and not admissible pursuant to Utah Code Annotated section 78–3a–116(5)

(2002). "Application of statutory law to the facts presents a mixed question of fact and law. We review the juvenile court's findings for clear error and its conclusions of law for correctness, affording the court 'some discretion in applying the law to the facts.' " *In re G.B.*, 2002 UT App 270,¶ 11, 53 P.3d 963 (quoting *In re C.B.*, 1999 UT App 293,¶ 5, 989 P.2d 76).

¶ 12 Finally, Father claims that the evidence was insufficient to substantiate him for sexual and emotional abuse by a preponderance of the evidence, and insufficient to support a finding, by clear and convincing evidence, that the children remained neglected and emotionally abused. Father "must marshall [sic] the evidence in support of the findings and then demonstrate that despite this evidence, the [juvenile] court's findings are so lacking in support as to be against the clear weight of the evidence." *In re E.R.*, 2001 UT App 66,¶ 5, 21 P.3d 680 (alterations in original) (quotations and citations omitted).

## ANALYSIS

### I. The CJC Videotape

¶ 13 Father claims that the court erred when it prohibited him from using the videotape to elicit testimony regarding L.N.'s inability to distinguish between reality and fantasy. Additionally, Father claims this error was exacerbated when the court allowed the videotape to be admitted for purposes of demonstrating L.N.'s demeanor and state of mind.[3] We find no merit to Father's conten-

---

2. The court properly noted that the sexual abuse findings were substantiated under the lower preponderance of the evidence standard, *see Department of Human Servs. v. B.R.*, 2002 UT App 25,¶ 12, 42 P.3d 390, rather than the higher clear and convincing or proof beyond a reasonable doubt standards.

3. Specifically, the court made the following ruling:

   I've said the videotape is not reliable when the child makes statements that this person touched me or not, because of the child's condition. He's obviously ... one of the more anxious and confused and disturbed children I'd ever seen in a videotape.
   Because of that situation I can't allow to make a finding of fact that Dad or Mom committed

abuse based upon his statement in the videotape. That videotape can surely be placed into evidence to show the child's emotional condition, obviously.

Even if we were to assume that the court erred in admitting the videotape to show L.N.'s emotional condition, it appears from the record that the videotape was never offered for this purpose.

   MR. WALDRON [Guardian Ad Litem]: Well, the Court did allow the videotape for purposes of the demeanor of the children.
   THE COURT: Right. That's true, yeah.
   MR. WALDRON: And I think that the Court—
   THE COURT: Nobody's requested that [the videotape] be admitted into evidence during this hearing. I just indicated that I could—I could review the videotapes for that purpose, but nobody's requested that.

tion. Although the court did use the videotape to find L.N. unavailable as a witness, it is clear from the following remarks that the court agreed with Father:

> When I viewed that videotape I felt like that we had just gotten started in trying to determine whether or not L.N. could tell the truth—tell the difference between the truth and a lie.
>
> I've always used at least three or four hypothetical questions, but in this videotape the question was initiated and not followed through. I felt like I had to know more, because L.N. obviously was a little bit scatter brained, and I wanted more information. I wanted a more vigorous structure for questioning L.N.
>
> So as far as that goes, I don't think that would help me at all, because I don't think that it was done in such a fashion that I could be confident in making the decision as to whether or not L.N. was telling the truth, knew the difference between truth and a lie, based on that initial part of the videotape. So I don't think it's relevant, and so I'm not going to admit it into evidence anyway.

¶ 14 Thus, Father's claim on appeal that "[t]he court erred in prohibiting [him] from eliciting testimony regarding LN's inability to differentiate between reality and fantasy, including prohibiting the use of the CJC videotape itself and testimony about the videotaped interview" is pointless. The court agreed with Father, and acknowledged the inadequacies of the interview and the inability of L.N. to distinguish between reality and fantasy.

## II. Unreliability of L.N.'s Statements Due to Incompetence

■ ¶ 15 In addition to the videotaped statements made by L.N., Father argues that all of L.N.'s statements are inadmissible because they are unreliable due to his incompetence. Father asserts that the court must determine whether L.N. is competent under rule 403 of the Utah Rules of Evidence before any of his statements can be admitted. "In the past, competency requirements served to ensure that the jury would not be exposed to unreliable testimony; now Rule 403 can be employed to serve a very similar function." *State v. Fulton,* 742 P.2d 1208, 1218 (Utah 1987). According to *Fulton,* "the elements of competency outlined in our past case law are not wholly irrelevant to a Rule 403 determination." *Id.* at 1218 n. 15.

¶ 16 Father is correct that rule 403 is the appropriate avenue to be used by trial courts in determining a witness's competence as well as whether the probative value of a witness's testimony is " 'substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.' " *Fulton,* 742 P.2d at 1218 (quoting Utah R. Evid. 403). However, the concerns expressed in rule 403 are primarily relevant to jury trials. In this case, the judge heard the evidence, ruled on its admissibility, and rendered a judgment based on the law and facts. As pointed out by Father, the issue is not whether the judge is more or less likely than a jury to be inflamed by the statements, but instead whether the statements were unreliable due to L.N.'s incompetence. We conclude, however, that the court properly considered the issue of L.N.'s competence by giving less weight to L.N.'s statements.

## III. Statements Made to a Person in a Trust Relationship

¶ 17 The trial court also properly identified as an issue the definition of "trust relationship." Utah Code Annotated section 78–3a–116(5) (2002) provides: "For the purpose of establishing the fact of abuse, neglect, or dependency, the court may, in its discretion, consider evidence of statements made by a minor under eight years of age to a person in a trust relationship." *Id.* Neither the statute, nor case law, defines "trust relationship." Father draws a distinction between a "relationship of trust" and a "position of trust." He argues that, in order to be admissible, L.N.'s statements must have been made to a person that L.N. actually trusted. He further argues that, in order to have the requisite indicia of reliability, the "trust relationship" must exist when the statements were made. He contrasts this with state-

ments made to a person who occupies a *position* of trust, objectively viewed, which may not carry a comparable indicia of reliability.

### A. L.N.'s Statements to Shelter Mother, Michelle

¶ 18 With regard to Utah Code Annotated section 78-3a-116(5), the trial court made the following observations and ruling:

I think that this statute was probably put in place by the Legislature for a situation almost like this, where a child is in the care of someone in a trust relationship. When I look at a trust relationship in sort of an objective sense, initially that is parent/child, teacher/student, maybe Boy Scout leader and Boy Scout, but especially I think foster mother and child is by definition a trust relationship.

In fact, if I remember correctly, L.N. immediately became attached to the foster mother and did confide in her, simply by revealing what he stated. That would not be easy to do for a child unless he probably felt some trust.

I'm going to make a ruling that even with the short period of time, by living with that person for a couple of days and indicating his trust in that person by making the statement—so it's kind of a circular argument, in fact—that based upon the statute I'm going to go ahead and make a finding that there was a trust relationship between the initial foster mother—I think her name was Michelle, wasn't it?—and L.N.

¶ 19 Contrary to the trial court's statement that "foster mother and child is by definition a trust relationship," the statute requires more than simply the "position" of foster mother. In order for L.N.'s statements to satisfy the requirements of the statute, and to carry an indicia of reliability equal to those made "to a person in a trust relationship," Utah Code Ann. § 78-3a-116(5), it must be demonstrated that L.N. in fact trusted Michelle, as well as that L.N. and Michelle were in a "trust relationship" when the statements

were made. This, Father argues, cannot be shown under the facts of this case; that is, given that only a few days had elapsed between the time L.N. came to live with Michelle and the time he made some of the statements, a "trust relationship" could not have existed when L.N. made some of the statements. In this case, however, the court examined the nature of the relationship before determining that a trust relationship existed. The court found that L.N. immediately became attached to Michelle, and that L.N. was confiding in Michelle when he made the statements. Thus, the trial court did not err in finding that a trust relationship existed between L.N. and Michelle at the time L.N. made the statements to her about Father.

### B. L.N.'s Statements to Intern Therapist, Ms. Coyne

¶ 20 The State sought to introduce statements made by L.N. to Ms. Coyne under rule 803(4) of the Utah Rules of Evidence, the hearsay exception covering "[s]tatements for purposes of medical diagnosis or treatment." Utah R. Evid. 803(4). Father objected.[4] After limited discussion of the issue, the court asked whether the statements could be admitted pursuant to the trust relationship statute. *See* Utah Code Ann. § 78-3a-116(5).

¶ 21 We do not reach the merits of Father's contention that L.N.'s statements to Ms. Coyne do not qualify as hearsay exceptions either under rule 803(4), or under the trust relationship statute. Even without Ms. Coyne's testimony, the testimony from Kari, Michelle, and Mr. Davis is sufficient to substantiate Father for sexual and emotional abuse. L.N. told Michelle that Father likes L.N. to be naked and that Father touches L.N.'s private parts. L.N. told Mr. Davis that Father touched him "with a stick" in the genital region, and that Father used his penis to touch L.N. in the "peepee area." L.N. told Kari about a naked game that Father had taught him.

---

4. Among other things, Father objected to the admission of the statements under rule 803(4) of the Utah Rules of Evidence because Ms. Coyne was a graduate student at the University of Utah's Graduate School of Social Work and an intern working under the supervision of a licensed therapist.

¶ 22 We do not analyze and address in writing the remaining issues Father raises on appeal because we have reviewed them and found them to be without merit. *See Springville Citizens for a Better Cmty. v. The City of Springville*, 1999 UT 25, ¶ 20 n. 2, 979 P.2d 332; *see also State v. Allen*, 839 P.2d 291, 303 (Utah 1992) (permitting appellate courts to decline to analyze and address in writing every issue or claim raised).

## CONCLUSION

¶ 23 The trial court did not err in substantiating Father for sexual and emotional abuse, and finding that L.N. and S.N. remained emotionally abused and neglected.

¶ 24 We therefore affirm.

¶ 25 WE CONCUR: PAMELA T. GREENWOOD and GREGORY K. ORME, Judges.