**2017 UT App 235**

## THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF A.J. AND A.J.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

B.J.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20160134-CA
Filed December 29, 2017

Fourth District Juvenile Court, American Fork Department
The Honorable Suchada P. Bazzelle
No. 1101463

Janell R. Bryan, Attorney for Appellant

Sean D. Reyes, Carol L.C. Verdoia, and John M.
Peterson, Attorneys for Appellee

Martha Pierce, Guardian ad Litem

JUDGE MICHELE M. CHRISTIANSEN authored this Opinion, in
which JUDGES GREGORY K. ORME and DAVID N. MORTENSEN
concurred.

CHRISTIANSEN, Judge:

¶1      B.J. (Father) appeals the juvenile court's order terminating
his parental rights to A.J. (Older Child) and A.J. (Younger Child).
We affirm.

BACKGROUND

¶2　Father and J.E. (Mother) are the natural parents of Older Child and Younger Child. In June 2014, the Division of Child and Family Services (DCFS) filed a petition for custody after Older Child told a teacher at her school that during a May 2014 argument, Father and Mother had physically pulled her arms and legs in different directions, causing Older Child to "slam[]" her face on the ground. After a shelter hearing, the children were removed from the parents' custody and placed into DCFS's custody.

¶3　In July 2014, the juvenile court ordered DCFS to conduct a risk assessment on Father. The risk assessment revealed "serious concerns" that Father had a substance abuse problem. Based on the risk assessment, DCFS recommended that Father submit to random drug tests, reduce his medication dosages, participate in substance abuse treatment, participate in psychological testing and follow any recommendations therefrom, attend a parenting program, and undergo a domestic violence assessment. Although the juvenile court did not order services for Father at that time, DCFS arranged for random drug testing and assessments so that Father could start addressing the identified concerns before adjudication. Father did not participate in any services until they were later ordered.

¶4　In February 2015, the juvenile court held a pretrial hearing on the State's amended verified petition to adjudicate the children as neglected. Father entered a plea under rule 34(e) of the Utah Rules of Juvenile Procedure, by which he stipulated to several allegations in the State's amended verified petition and "neither admitted nor denied" other allegations. The juvenile court therefore deemed the allegations in the petition to be true.[1] Among other things, the court found the following

_____

1. Pursuant to rule 34(e), "[a] respondent may answer by admitting or denying the specific allegations of the petition, or
(continued…)

allegations to be true: (1) Older Child had been injured as a result of the May 2014 incident between Father and Mother; (2) Father "[has] a substance abuse problem and such problem interfere[s] with [his] ability to parent [the] children"; (3) Father and Mother "have a history of domestic violence"; and (4) "the children have been present during fights between the parents and are impacted by the exposure to domestic violence." The juvenile court adjudicated the children as neglected by Father.

¶5     The juvenile court also approved a service plan, which required Father to (1) participate in a mental health evaluation, "specifically [a] psychological evaluation"; (2) submit to a substance abuse assessment; (3) participate in random urinalysis tests; (4) "[s]ign any required releases of information for all medical, psychological, domestic violence, and/or substance abuse treatment providers [and] provide copies to DCFS"; (5) participate in a domestic violence assessment; (6) visit with the children on a regular basis; (7) "[m]aintain stable and appropriate housing"; (8) maintain employment; and (9) participate in a parenting program. The court also directed DCFS to conduct pill counts of Father's medications, and Father acknowledges this included the requirement to take his pills as prescribed.

¶6     In March 2015, the juvenile court found that Father had made "[l]ittle progress" with his service plan and scheduled a permanency hearing for June 15. At the permanency hearing, the juvenile court determined that both parents had "failed to participate in, comply with, in whole or part, or to meet the goals of [the] court approved treatment plan" and changed the permanency plan for the children to adoption. Regarding Father

---

(…continued)

by declining to admit or deny the allegations. Allegations not specifically denied by a respondent shall be deemed true." Utah R. Juv. P. 34(e).

specifically, the court observed that Father had attended a substance abuse assessment and was attending the recommended therapy. Father had attended thirty drug tests, but he had also missed forty drug tests. In addition, "DCFS had been conducting pill counts and many of [Father's] prescriptions were off count, indicating he was not using his medications as prescribed." The court observed that Father had completed a psychological evaluation but had not followed the recommendations from that evaluation. Father also had not completed a domestic violence assessment or parenting program. Father's attendance at visits with the children had improved, but he had still missed three out of twelve scheduled visits.

¶7 The State filed a petition to terminate the parents' parental rights on July 1, 2015. In the petition, the State asserted that it had been provided with a copy of an independent medical evaluation (the Medical Evaluation) conducted on Father in November 2013. The Medical Evaluation was prepared by Dr. Mattingly in response to Father's complaints of ongoing injuries from a September 2011 work accident. Although Father's doctor had cleared him to go back to work later that year, Father did not return to work, asserting that he had migraines from the work accident. According to the State, Dr. Mattingly had concluded in her evaluation that Father's work injuries had been minor and had stabilized, that Father's complaints of headaches had not been substantiated by any objective findings, and that Father had "opioid dependence and abuse/opioid dependence." The Medical Evaluation also included Father's medical records from September 2011, the time of Father's work accident, to November 2013.

¶8 Father filed a motion in limine seeking to suppress both Dr. Mattingly's testimony and the Medical Evaluation. Father observed that the Medical Evaluation included "many pages of [his] Medical Records" and asserted that the Medical Evaluation was "protected by the confidentiality owed him by his

physicians and treatment providers." In its response, the State argued that Father's physical and emotional health were at issue and that there was "no violation of confidentiality rules." The State further asserted that Mother had given the Medical Evaluation to DCFS.[2] According to the State, Father "had left [the Medical Evaluation] in the couples' home and allowed [Mother] to have the document"; therefore, Father had waived any privilege to the information in the Medical Evaluation.

¶9    The juvenile court did not rule on the admissibility of the Medical Evaluation until the first day of the termination trial in November 2015.[3] The court initially declined to admit the Medical Evaluation but allowed Dr. Mattingly to testify. The court noted that it would strike Dr. Mattingly's testimony if Father did not assert a medical defense justifying "his substance use." Father later presented testimony from one of his doctors, Dr. Dana, that he had prescribed buprenorphine, commonly known as Suboxone or Subutex, based on Father's frequent headaches and migraines.[4] Accordingly, the juvenile court observed that "a medical defense [was] being launched." The court then determined that Dr. Mattingly's testimony had

---

2. Mother testified that she found the Medical Evaluation in a storage unit she shared with Father and gave the Medical Evaluation to DCFS.

3. Mother voluntarily relinquished her parental rights on the last day of the termination trial. She is not a party to this appeal.

4. Buprenorphine is a schedule III controlled substance intended for the treatment of pain (Buprenex) and opioid addiction (Suboxone and Subutex). Drug & Chemical Evaluation Section, Office of Diversion Control, Drug Enforcement Administration, *Buprenorphine* (July 2013), https://www.deadiversion.usdoj.gov/drug_chem_info/buprenorphine.pdf [https://perma.cc/K3XS-NQ8R].

authenticated the Medical Evaluation, and the court admitted the Medical Evaluation in its entirety into evidence.

¶10   In its written order terminating Father's parental rights, the juvenile court acknowledged that the Medical Evaluation "was performed at the request of an insurance company opposing [Father's] worker's compensation benefits." Thus, the court determined, "the analysis and conclusions of [the Medical Evaluation] were likely to be biased," and the court "gave them no weight in reaching its decision." However, the court observed that the Medical Evaluation also contained "a compilation of [Father's] medical history that was a recitation of treatment notes from other treatment providers." The court found that "this section of the evaluation was sufficiently objective to be reliable and useful in understanding the context and history of the medical treatment [Father] received for his work injury." The court stated that it "did rely on Dr. Mattingly's compilation of [Father's] medical records" to assess Father's medical defense "that he was using prescription medications for medical reasons." In its written findings, the juvenile court referred to the medical history from the Medical Evaluation numerous times and concluded that Father "is a drug addict."

¶11   The juvenile court terminated Father's parental rights based on five different grounds. The court found that (1) Father had neglected the children "by exposing them to incidents of domestic violence, by not attending to the children's needs, by not providing them a safe and stable home environment, and by exposing them to drug use"; (2) Father was an unfit or incompetent parent based on his "serious substance abuse problem"; (3) the children had been in an out-of-home placement, and Father "has substantially neglected, or has been unable or unwilling to remedy the circumstances that cause[d] the children to be in an out-of-home placement, and there is a substantial likelihood that [Father] will not be capable of exercising proper and effective parental care in the near future"; (4) Father had failed to make a parental adjustment "in that [he]

was not able to achieve the goals of the DCFS service plan and demonstrate he could be a responsible parent"; and (5) Father had made "insufficient efforts . . . to support the children, to prevent further neglect of them, to eliminate the risk of serious harm to the children, and to avoid being an unfit parent." The juvenile court also found that it was "strictly necessary" and in the best interests of the children to terminate Father's parental rights.

¶12    Father now appeals the juvenile court's order terminating his parental rights.

ISSUES AND STANDARDS OF REVIEW

¶13    Father raises four issues on appeal. First, he contends that "[t]he Medical Evaluation was unfairly prejudicial and required complete exclusion." Second, in a related argument, Father contends that "[t]he Medical Evaluation was a private document and reliance on any portion thereof cannot justify termination of parental rights." "A trial court has broad discretion to admit or exclude evidence and its determination typically will only be disturbed if it constitutes an abuse of discretion." *In re L.N.*, 2004 UT App 120, ¶ 9, 91 P.3d 836 (citation and internal quotation marks omitted). "The existence of a privilege [or an exception thereto] is a question of law, which we review for correctness." *State v. Worthen*, 2008 UT App 23, ¶ 9, 177 P.3d 664 (alteration in original) (citation and internal quotation marks omitted), *aff'd*, 2009 UT 79, 222 P.3d 1144.

¶14    Third, Father contends that without the Medical Evaluation, "[t]he remaining evidence was insufficient to support termination" of his parental rights. We recognize that juvenile court judges have special training, experience, and interest in their field, as well as the opportunity to judge credibility firsthand; consequently, we review a juvenile court's decision to terminate parental rights deferentially and will not disturb the juvenile court's findings and conclusions unless the

preponderance of the evidence clearly militates against the findings made or the court has otherwise abused its discretion. *In re A.B.*, 2007 UT App 286, ¶ 10, 168 P.3d 820; *In re R.A.J.*, 1999 UT App 329, ¶ 6, 991 P.2d 1118. "When a foundation for the court's decision exists in the evidence, an appellate court may not engage in a reweighing of the evidence." *In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435.

¶15 Fourth, Father contends that DCFS failed to make reasonable efforts to provide reunification services. "[D]etermining whether or not DCFS has provided reasonable services to parents requires trial judges to observe facts[] . . . relevant to the application of the law that cannot be adequately reflected in the record available to appellate courts." *In re A.C.*, 2004 UT App 255, ¶ 12, 97 P.3d 706 (second alteration and omission in original) (citation and internal quotation marks omitted). Accordingly, the juvenile court has broad discretion in determining whether DCFS made reasonable efforts at reunification. *Id.*

ANALYSIS

I. Any Error in Admitting the Medical Evaluation Was Harmless.

¶16 Father's first two contentions involve the Medical Evaluation. First, he contends that "[t]he Medical Evaluation was unfairly prejudicial and required complete exclusion" under Utah Rule of Evidence 403. Second, he contends that "[t]he Medical Evaluation was a private document and reliance on any portion thereof cannot justify termination of parental rights." More specifically, he asserts that the Medical Evaluation was privileged under Utah Rule of Evidence 506.

¶17 Rule 403 provides:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a

danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Utah R. Evid. 403. Rule 506 provides that "[a] patient has a privilege, during the patient's life, to refuse to disclose and to prevent any other person from disclosing information that is communicated in confidence to a physician or mental health therapist for the purpose of diagnosing or treating the patient." *Id.* R. 506(b). But the privilege is not absolute. *State v. Worthen*, 2008 UT App 23, ¶ 10, 177 P.3d 664, *aff'd*, 2009 UT 79, 222 P.3d 1144. Rule 506 contains certain exceptions to the patient privilege, including the directive that "[n]o privilege exists . . . [f]or communications relevant to an issue of the physical, mental, or emotional condition of the patient . . . in any proceeding in which that condition is an element of any claim or defense." Utah R. Evid. 506(d)(1)(A).

¶18 We need not address Father's evidentiary arguments at great length because, even if the juvenile court erred by admitting the Medical Evaluation, any error in admitting such evidence was harmless. *See State v. Hamilton*, 827 P.2d 232, 240 (Utah 1992) ("We do not determine whether the evidence was admitted improperly, because we conclude that any error in its admission was harmless."). "Harmless error 'is an error that is sufficiently inconsequential that there is no reasonable likelihood that it affected the outcome of the proceedings.'" *In re A.R.*, 2017 UT App 153, ¶ 12, 402 P.3d 206 (quoting *H.U.F. v. W.P.W.*, 2009 UT 10, ¶ 44, 203 P.3d 943).

¶19 Here, the juvenile court initially declined to admit the Medical Evaluation, but the court allowed Dr. Mattingly to testify on the condition that "at the conclusion of the trial[,] if any kind of medical defense has not been launched by [Father], it's possible that this testimony is not relevant and I could then strike that testimony." Later in the trial, Dr. Dana testified that when Father came into his clinic, he was having frequent, severe

headaches that "seemed to have characteristics of migraine." Dr. Dana testified that based on Father's frequent headaches and migraines, he prescribed buprenorphine. Observing that "a medical defense is being launched," the juvenile court determined that Dr. Mattingly's testimony had authenticated the Medical Evaluation, and the court admitted the Medical Evaluation into evidence.

¶20 In its written order terminating Father's parental rights, the juvenile court determined that "the analysis and conclusions of [the Medical Evaluation] were likely to be biased," and the court "gave them no weight in reaching its decision." However, the court observed that the Medical Evaluation also contained "a compilation of [Father's] medical history that was a recitation of treatment notes from other treatment providers." The court "found that this section of the evaluation was sufficiently objective to be reliable and useful in understanding the context and history of the medical treatment [Father] received for his work injury." The court stated that it "did rely on Dr. Mattingly's compilation of [Father's] medical records" to assess Father's medical defense "that he was using prescription medications for medical reasons."

¶21 On appeal, Father does not dispute that he launched a medical defense at trial. *See* Utah R. Evid. 506(d)(1)(A). Indeed, he acknowledges that his "defense at trial was that he suffered from migraines, which justified his prescription medication." Father asserts that "the Medical Evaluation had the undue tendency to improperly suggest [he] was a drug addict, which was unfairly prejudicial," and that his use of a medical defense "did not entitle the State to access all of [his] past medical records to rebut such defense in favor of termination." According to Father, the juvenile court erred when it "found his entire medical history as discoverable and admissible based on his defense of one medical complaint for headaches."

¶22 Our supreme court has acknowledged that "[r]ule 506 is only broad enough to allow the disclosure of information

relevant to an element of any claim or defense." *Sorensen v. Barbuto*, 2008 UT 8, ¶ 10, 177 P.3d 614. "Therefore, rule 506(d)(1) is a limited waiver of privilege, confined to court proceedings, and restricted to the treatment related to the condition at issue." *Id.* "[A] waiver under rule 506(d)(1) does not mean that the patient has consented to the disclosure of his entire medical history." *Id.*

¶23 Assuming, for the sake of argument, that the Medical Evaluation contained privileged information,[5] the fact that Father asserted a medical defense did not automatically entitle the juvenile court to rely on Father's comprehensive medical history in terminating his parental rights. *Cf. id.* After reviewing the record, it does appear that the juvenile court failed to properly assess the admissibility of the Medical Evaluation and to limit its consideration of the evaluation "to the treatment related to the condition at issue." *See id.* Nevertheless, we conclude that any error in the juvenile court's admission of, and reliance on, the Medical Evaluation was harmless. *See In re A.R.*, 2017 UT App 153, ¶ 12. As explained in Part II of this opinion, there was sufficient independent evidence demonstrating that Father had a substance abuse issue and sufficient evidence to

---

5. Father asserts, without citation to the record, that "[t]he parties agree the Medical Evaluation is privileged and meets the definitions of [Utah Rule of Evidence] 506(b)." This assertion appears to be incorrect, as the State asserts that "[n]either Dr. Mattingly's testimony nor the [Medical Evaluation] were privileged because of the nature of Father's encounter with Dr. Mattingly," i.e., Father had no physician-patient relationship with Dr. Mattingly, because Dr. Mattingly "did not examine Father or prepare [the Medical Evaluation] for treatment; it was conducted for the sole purpose of determining his fitness to return to work." The State further asserts that "even if privilege exists," Father waived the privilege when he launched a medical defense at trial.

support the juvenile court's ultimate decision to terminate Father's parental rights.[6]

## II. Sufficient Evidence Supports the Juvenile Court's Termination of Father's Parental Rights.

¶24 Father contends that "if the Medical Evaluation and Dr. Mattingly's testimony [had] been properly excluded," the remaining evidence was insufficient "to support the juvenile court's findings and conclusion that the children are neglected as to Father." The State, on the other hand, contends that "[e]ven assuming admitting Dr. Mattingly's testimony and the [Medical Evaluation] was error, it was necessarily harmless because other sufficient evidence existed to terminate Father's parental rights." We agree with the State.

¶25 "Utah law requires a court to make two distinct findings before terminating a parent-child relationship." *In re R.A.J.*, 1999 UT App 329, ¶ 7, 991 P.2d 1118. "First, the court must find that the parent is below some minimum threshold of fitness, such as finding that a parent is unfit or incompetent based on any of the grounds for termination under section [78A-6-507] of the Utah Code." *Id.* (citation and internal quotation marks omitted); *see also* Utah Code Ann. § 78A-6-507(1) (LexisNexis 2012) (listing the grounds for termination of parental rights). Pursuant to section 78A-6-507(1), the finding of a single enumerated ground is sufficient to warrant the termination of parental rights. *See* Utah

---

6. Father also asserts that the State "had no right to the Medical Evaluation provided . . . by Mother" because it is a private medical record under the Government Records Access and Management Act and that the State violated the Health Insurance Portability and Accountability Act "by disclosing the Medical Evaluation without Father's consent." Given our determination that there was sufficient evidence to terminate Father's parental rights without the Medical Evaluation, we need not address these issues.

Code Ann. § 78A-6-507(1). "Second, the court must find that the best interests and welfare of the child are served by terminating the parents' parental rights." *In re R.A.J.*, 1999 UT App 329, ¶ 7; *see also* Utah Code Ann. § 78A-6-506(3) (LexisNexis 2012). "A petitioner has the burden of establishing both of these elements by clear and convincing evidence." *In re R.A.J.*, 1999 UT App 329, ¶ 7; *see also* Utah Code Ann. § 78A-6-506(3). Father does not challenge the juvenile court's determination that termination of his parental rights was in the children's best interests, and we therefore address only the parental fitness element of the statutory test.[7]

¶26  The juvenile court terminated Father's parental rights on five different grounds: (1) Father had neglected the children "by exposing them to incidents of domestic violence, by not attending to the children's needs, by not providing them a safe and stable home environment, and by exposing them to drug use"; (2) Father was an unfit or incompetent parent based on his "serious substance abuse problem"; (3) the children had been in an out-of-home placement, and Father "has substantially neglected, or has been unable or unwilling to remedy the circumstances that cause[d] the children to be in an out-of-home placement, and there is a substantial likelihood that [Father] will not be capable of exercising proper and effective parental care in the near future"; (4) Father had failed to make a parental adjustment "in that [he] was not able to achieve the goals of the DCFS service plan and demonstrate he could be a responsible parent"; and (5) Father had made "insufficient efforts . . . to support the children, to prevent further neglect of them, to eliminate the risk of serious harm to the children, and to avoid being an unfit parent." *See* Utah Code Ann. § 78A-6-507(1)(b)–(f).

---

7. In his reply brief, Father generally asserts that if grounds for termination are present, "best interests can then be considered." But Father provides no analysis regarding the children's best interests in this case.

So long as sufficient evidence existed to support at least one of the grounds found by the court, the termination of Father's parental rights was appropriate.

¶27 On appeal, Father focuses his arguments on the juvenile court's determination that he had neglected the children "by exposing them to drug use" and was an unfit parent based on his "serious substance abuse problem." *See* Utah Code Ann. § 78A-6-507(1)(b), (1)(c). As previously discussed, Father asserts that if the Medical Evaluation had not been admitted into evidence, "the remaining evidence would have been insufficient to terminate [his parental] rights."

¶28 Utah Code section 78A-6-507 provides, among other things, that a court may terminate a parent's parental rights if the court finds that "the parent has neglected or abused the child" or that "the parent is unfit or incompetent." *Id.* Section 78A-6-508 provides, in relevant part, that "[i]n determining whether a parent or parents are unfit or have neglected a child the court shall consider, but is not limited to, the following circumstances, conduct, or conditions: . . . (c) habitual or excessive use of intoxicating liquors, controlled substances, or dangerous drugs that render the parent unable to care for the child." *Id.* § 78A-6-508(2)(c) (LexisNexis 2012). We conclude that, even after setting aside the Medical Evaluation, sufficient independent evidence exists to support the juvenile court's conclusion that Father had a substance abuse problem and had exposed the children to drug use.

¶29 To begin with, in his rule 34(e) plea, Father admitted that he had a "substance abuse problem" and that it interfered with his ability to parent the children. Nevertheless, when confronted by this admission at trial, Father denied having a substance abuse problem.

¶30 Mother's trial testimony also indicated that Father had a substance abuse problem. Mother testified that after his work accident, Father "pretended to have headaches and different

things to get pain medication." Mother stated, "[W]e'd go to the doctors and on the way there [Father would] be rubbing his eyes, . . . or doing certain things to get prepared to go to the doctor before we got there." Mother explained, "[W]e were going for the pain pills, that's what we were doing it for." Mother stated that when Father got pain medication, they would "split the bottle." She stated they "smoked [instant release oxycodone] and we would sniff them, we'd swallow them." Mother explained:

> [I]t took about a year and a half to actually get that high dosage of the medication. But before then we were just . . . sniffing the [L]ortab or the low dose of the [Percocet] that [Father] got at first. [H]e did a whole bunch of different treatments to get what we wanted. Once we got what we wanted, that's where we stayed with it every time we went to the doctor.

According to Mother, Older Child sometimes went to the doctor with them, and Father "would just start acting . . . sad . . . so [Older Child] would be like putting her arms around him like, it's okay[,] but it's just putting on a show for the doctor to be looking at him like, he's really hurt."

¶31 Mother further testified that when the family lived in a different house, she and Father used drugs in their bedroom or in a shed behind the house. The parents would leave Older Child to watch Younger Child when they did this. Older Child told DCFS that Mother and Father would "do nothing but sit in the shed" and that when Mother and Father were in the shed, she and Younger Child "couldn't spend . . . time with them." According to a DCFS caseworker, in her first visits with the children, Older Child understood that the children had been removed from their parents' custody, in part, because their parents had been doing drugs in the shed.

¶32    As part of his service plan, Father was required to submit to random urinalysis tests. The DCFS caseworker testified that Father "did fairly well in the beginning" and only "missed a few here and there." However, between August 27, 2015, and October 6, 2015, Father missed six urinalysis tests. He also tested positive for Xanax in October 2015. Father did not have a prescription for Xanax. Rather, at that time, Father had prescriptions only for Ambien and Suboxone, so the DCFS caseworker presumed he had gotten the Xanax illegally. This occurred approximately one month before the beginning of the termination trial. Father acknowledged at trial that he had missed some tests, but he claimed it was due to his work.

¶33    The juvenile court had also ordered DCFS to conduct pill counts of Father's prescription medications. The court noted that "[a]t times the counts were off and at other times [Father] forgot to bring the pill[s]. The counts were not reliable because of the inconsistencies and [Father's] non-compliance." The DCFS caseworker testified that Father's pill counts were often unsuccessful because Father would forget to bring his medications, and he once brought three pills in his wallet without the prescription bottle, "so [she] couldn't double check when the prescription was filled." At the very first pill count, Father did not bring his Ambien with him, claiming that "he was told by the pharmacist that the Ambien would interact with the Suboxone and would kill him." Ultimately, Father "never brought his Ambien" to the pill counts, but when the DCFS caseworker called Father's doctor, "Ambien was still being prescribed to [Father]." The DCFS caseworker also testified that Father had told her that he was trying to get off of his prescription medications. The caseworker had requested several times that Father sit down with his current doctor and "come up with an actual written plan to [wean him] off of the Suboxone if that's what he was planning on doing," but Father never submitted a plan.

¶34 Based on the foregoing, we conclude that there was sufficient evidence apart from the Medical Evaluation from which the juvenile court could conclude that Father was unfit due to his failure to address his substance abuse problem.[8] Thus,

8. We note that Father does not directly address the juvenile court's grounds for termination under Utah Code section 78A-6-507(1)(d) and (1)(f). *See* Utah Code Ann. § 78A-6-507(1)(d) (LexisNexis 2012) (failure to "remedy the circumstances that cause the child to be in an out-of-home placement" and "there is a substantial likelihood that the parent will not be capable of exercising proper and effective parental care in the near future"); *id.* § 78A-6-507(1)(f) (failure of parental adjustment). We could affirm on this failure alone. *See, e.g., In re B.C.*, 2016 UT App 208, ¶ 6, 385 P.3d 705 (per curiam) ("Because Mother does not challenge the grounds of neglect, unfitness, or token efforts, this court need not review her claim that the evidence was insufficient to support the grounds of abandonment."); *In re N.M.*, 2007 UT App 16U, para. 2 (per curiam) (observing, where the juvenile court terminated the mother's parental rights on multiple grounds and the mother challenged only one ground on appeal, that the mother had implicitly conceded that there was adequate evidentiary support for the juvenile court's other grounds for termination).

Further, Father does not address the issue of domestic violence. Instead, he cursorily asserts that domestic violence was "not the focus at trial." Where a party fails to marshal the evidence in support of a challenged finding, the party "will almost certainly fail to carry its burden of persuasion on appeal." *State v. Nielsen*, 2014 UT 10, ¶ 42, 326 P.3d 645. Father has not marshaled the evidence supporting the juvenile court's finding of domestic violence, nor has he demonstrated that the evidence clearly preponderates against the findings made regarding domestic violence or that the juvenile court otherwise abused its discretion. *See In re A.B.*, 2007 UT App 286, ¶ 10, 168 P.3d 820; *In re R.A.J.*, 1999 UT App 329, ¶ 6, 991 P.2d 1118.

the evidence supports the juvenile court's decision to terminate Father's parental rights on the basis of unfitness.

### III. DCFS Made Reasonable Efforts to Reunite Father with the Children.

¶35 Lastly, Father contends that DCFS failed to make reasonable efforts to provide reunification services.

¶36 Pursuant to Utah Code section 78A-6-507, "in any case in which the court has directed the division to provide reunification services to a parent, the court must find that the division made reasonable efforts to provide those services before the court may terminate the parent's rights under Subsection (1)(b), (c), (d), (e), (f), or (h)." Utah Code Ann. § 78A-6-507(3)(a) (LexisNexis 2012). "DCFS [complies] with its statutory obligation to make reasonable efforts toward reunification if it makes a fair and serious attempt to reunify a parent with a child prior to seeking to terminate parental rights." *In re A.C.*, 2004 UT App 255, ¶ 14, 97 P.3d 706.

¶37 The juvenile court determined that "[r]easonable efforts were made by DCFS to facilitate treatment for [Father]." The court observed:

> Although the Petition was not adjudicated as to [Father] until February 2015, DCFS immediately set him up with services in July 2014, so as not to delay [Father] receiving necessary treatment. He was set up with random drug testing, he was provided referrals for assessments and given information for parenting programs. If there was delay in treatment, the delay was caused by [Father]. DCFS could not have done anything more to assist [Father] in addressing identified concerns in being a parent.

The court also noted that Father did not participate in any services until they were ordered by the court.

¶38 Although Father's argument is framed as such, Father does not truly argue that DCFS failed to provide him with the proper level of assistance in obtaining the required services. Instead, the thrust of Father's argument is that, despite his alleged substantial compliance with the service plan, DCFS still sought termination of his parental rights. However, Father's argument mischaracterizes the factual record, because Father did not substantially comply with the terms of his service plan.

¶39 Father's service plan required him to (1) participate in a mental health evaluation, "specifically [a] psychological evaluation"; (2) submit to a substance abuse assessment; (3) participate in random urinalysis tests; (4) "[s]ign any required releases of information for all medical, psychological, domestic violence, and/or substance abuse treatment providers [and] provide copies to DCFS"; (5) participate in a domestic violence assessment; (6) visit with the children on a regular basis; (7) "[m]aintain stable and appropriate housing"; (8) maintain employment; and (9) participate in a parenting program. The juvenile court also directed DCFS to conduct pill counts of Father's medications. Father acknowledges this included the requirement to take his pills as prescribed.

¶40 The juvenile court found that Father "did work on some objectives in the service plan" but that he "only partially complied with the plan by working on a few of the objectives." For example, Father failed to complete or make substantial progress on the domestic violence objective in his service plan. Indeed, before the start of the termination trial, Father had completed only two of the recommended twenty weeks of domestic violence treatment. Consequently, the juvenile court observed that "[t]he domestic violence objective contained in the service plan has not been addressed by [Father]" and that Father was still in need of domestic violence treatment.

¶41    Regarding the urinalysis testing requirement, Father missed six tests between August 27, 2015, and October 6, 2015. He also tested positive for Xanax in October 2015, a controlled substance for which he did not have a prescription. Father also made it difficult for DCFS to conduct pill counts by failing to bring his medications with him and by bringing three pills in his wallet without the prescription bottle, "so [the DCFS caseworker] couldn't double check when the prescription was filled." The juvenile court determined that "[t]he counts were not reliable because of the inconsistencies and [Father's] non-compliance."

¶42    Additionally, Father's compliance with the service plan's requirement that he "maintain safe, stable and appropriate housing" was questionable at best. Although Father had housing, he was sharing an apartment with another man who was receiving housing assistance for the unit. Father's name was not on the lease. Instead, Father was "allowed to live at the apartment at the will of the roommate." The juvenile court noted that "[t]here could be a possible violation of the housing assistance agreement because the housing authority was not informed [that Father] was living in the unit and there was no check of eligibility with [Father's] income." Thus, the juvenile court determined, "[t]here is concern about the stability of [Father's] housing."

¶43    Based on the foregoing, Father's assertion that he substantially complied with the service plan lacks merit.[9] As

---

9. Although Father does not specifically address the juvenile court's determination regarding failure of parental adjustment, *supra* ¶ 34 note 8, we note that Father's failure to substantially comply with his service plan is evidence of his failure of parental adjustment. *See In re J.T.*, 2012 UT App 253, ¶ 3, 286 P.3d 960 (per curiam); *see also* Utah Code Ann. §§ 78A-6-507(1)(e), -508(5) (LexisNexis 2012).

such, Father cannot demonstrate that DCFS's decision to seek termination is evidence of its failure to offer reasonable services when he failed to fully avail himself of the services DCFS did offer.

¶44 Father also briefly asserts that "DCFS had given up by the time of adjudication." However, the record speaks to the contrary. At trial, Father acknowledged that the DCFS caseworker encouraged him to begin services before they were ordered by the juvenile court, but he chose not to begin services because he was "upset." Father testified, "I didn't know how any of this was happening or how it was right because . . . I'm a great father."

¶45 The DCFS caseworker testified that after the State's petition was adjudicated in February 2015, she gave Father the information he needed to obtain his substance abuse assessment; Father did not complete the assessment until the end of March. She also stated that Father did not complete his psychological evaluation until the end of May and that he had canceled several appointments. The DCFS caseworker testified that she reminded Father that those assessments needed to be done, "especially since it wasn't just the assessment, he would have to follow whatever recommendations were [made] in that assessment." She testified that Father often acted like "he was hearing [what she told him] for the first time" and that she "wasn't sure if he was being manipulative necessarily or if he really truly didn't understand." The DCFS caseworker sent Father reminders via text message and in person; she tried "to use all different kinds of communication to make sure he understood everything." She also testified that she had ordered cognitive evaluations to determine if Father was capable of understanding what was required of him and that the test results indicated that Father "should be able to do these things."

¶46 In sum, we conclude that Father did not substantially comply with the service plan and that the juvenile court acted within its discretion when it found that DCFS had made

reasonable efforts to reunify Father with the children prior to terminating his parental rights. The record demonstrates that DCFS made reasonable efforts both before and after the State's petition was adjudicated to facilitate treatment for Father.

## CONCLUSION

¶47     We affirm the juvenile court's order terminating Father's parental rights.

———————